STEVE KATSETOS, ADMINISTRATOR (ESTATE OF FREDA KATSETOS) *v.* JOHN J. NOLAN ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued January 7—decision released April 20, 1976

*Henry J. Lyons,* for the appellant (named defendant).

*Gregory C. Willis,* for the appellant (defendant Clayton B. Weed, Jr.).

*Richard A. Silver,* with whom, on the brief, was *David S. Golub,* for the appellee (plaintiff).

BARBER, J. The defendants have appealed from a judgment rendered by the Superior Court in favor of the plaintiff administrator. In their preliminary statement of issues, error is claimed in numerous portions of the court's charge to the jury; in the court's denial of the defendants' motions to strike the testimony of four doctors called as expert witnesses for the plaintiff; in seventy-eight rulings by the court concerning the admission of evidence; in the court's denial of the defendants' motions for a directed verdict and judgment notwithstanding the verdict; and in the court's denial of the defendants' motions to set aside the verdict as excessive.

The trial required sixteen weeks, and the transcripts run close to 4000 pages. At the outset of this opinion, we shall briefly summarize the facts of the case, discussing particular rulings in more detail where warranted.

The decedent, Freda Katsetos, then forty-one, entered St. Joseph Hospital in Stamford on January 8, 1969, for delivery of her fourth child. She was the patient of the defendant, John J. Nolan, a physician specializing and board certified in gynecology and obstetrics. At 9:25 that morning, she

had a normal delivery of a normal child. Some twenty minutes later, the attending anesthesiologist, Frank J. D'Andrea, advised Dr. Nolan that Mrs. Katsetos was experiencing an abrupt and precipitous drop in blood pressure and a rapid pulse. At about this same time, the decedent entered into a state of shock. Dr. Nolan, suspecting internal bleeding, conducted a physical examination of the decedent and, on the basis of this and subsequent physical examinations, ruled out internal bleeding as the cause of shock. He then suspected either pulmonary embolism or amniotic fluid embolism as the probable diagnosis. The treatment of both of these conditions falls outside the realm of Dr. Nolan's specialty, and he therefore called upon the defendant Clayton B. Weed, Jr., for assistance.

Dr. Weed, who is board certified in the specialty of internal medicine, first examined the decedent at about 10:30 a.m. and listed the most probable diagnosis of the cause of shock as pulmonary embolism. The cause of shock was in fact severe internal bleeding, caused by a ruptured intrauterine artery. The bleeding was not discovered by either Dr. Nolan or Dr. Weed. At approximately 1:45 p.m., the decedent lapsed into unconsciousness, and at 5 p.m. on the same day she was pronounced dead.

The plaintiff administrator brought the present action, naming as defendants Dr. Nolan, Dr. Weed, Dr. D'Andrea, and St. Joseph Hospital, claiming that malpractice on the part of the doctors and the hospital had resulted in the wrongful death of the decedent. The complaint alleged that, although the decedent had exhibited the classic symptoms of severe internal bleeding, the defendant doctors had failed properly to diagnose the condition or perform any of the easily performed tests which would have

aided their diagnosis; that the defendant doctors failed to follow any of the recognized protocols for the treatment of shock; that the defendant doctors failed to remain in constant attendance upon their patient while she was in a critical condition; and that the defendant hospital failed properly to oversee the treatment given the decedent to ensure that she was given adequate care.

At trial, the plaintiff introduced an autopsy report and the testimony of a pathologist, to show that the cause of death was shock resulting from severe internal bleeding. He then presented four doctors as expert witnesses who testified that, from the symptoms exhibited, the decedent's condition should have been readily diagnosed by any practicing physician; that tests which would have conclusively affirmed or ruled out a diagnosis of internal bleeding were readily available, could have been performed easily and in little time, and should have been known to the doctors; that no recognized protocol for the treatment of shock had been followed, although the doctors knew or should have known of those protocols; and that, if the bleeding had been discovered, the decedent's life would probably have been saved. The jury returned a verdict in favor of the defendants D'Andrea and St. Joseph Hospital and against the defendants Nolan and Weed in the amount of $400,000. Judgment was rendered accordingly, despite the defendants' post-verdict motions.

The defendants' joint brief raises eight distinct issues, which we will consider in the order presented in their brief. The claims of error not briefed are considered abandoned. *DiMaggio* v. *Cannon,* 165 Conn. 19, 21, 327 A.2d 561; Maltbie, Conn. App. Proc. § 327.

## I

All four doctors called by the plaintiff were permitted to testify over the defendants' repeated objections that the doctors were not qualified to testify as experts and the court denied the defendants' motions to strike the testimony of each doctor. The defendants have assigned error in each of these rulings. A brief synopsis of the qualifications of each doctor, as presented at trial, will serve to place the defendants' claims in context.

Dr. Nathan Kase was, at the time of the trial, a professor and chairman of the department of obstetrics and gynecology at Yale Medical School and chief of the obstetrics and gynecology service at Yale-New Haven Hospital. He has been licensed to practice medicine and surgery in Connecticut and associated with Yale University since 1962. Prior to January 8, 1969, he was board certified as a specialist in obstetrics and gynecology and was on the consultant staff of hospitals in New Britain, New Haven and New London. Prior to January, 1969, he had visited Stamford Hospital once or twice per year for purposes of lecturing, conducting rounds and discussing the general state of his specialty as well as particular problems with local physicians. Physicians from the Stamford Hospital had referred patients to him on a regular basis. Dr. Kase testified that the diagnosis and treatment of shock fell within the field of all medical specialties, and within the field of the general practitioner. He testified that he was familiar with the standard of care ordinarily exercised by both physicians and surgeons in the Stamford area, in the state of Connecticut as a whole, in the New York City area, and in the nation as a whole in the care, treatment and

diagnosis of shock. He then testified that the standard of care in this regard was the same in Stamford, New York City, and throughout Connecticut.

Vincent Andriole was, both at the time of trial and in January, 1969, an associate professor of internal medicine at the Yale Medical School. He has been licensed to practice in Connecticut since 1961, and conducts daily rounds at Yale-New Haven Hospital. Prior to January, 1969, he was on the consultant staff of hospitals in Bridgeport, New Haven, and Hartford, and lectured at hospitals throughout Connecticut. He lectured at Stamford Hospital once every two years, had treated patients at Stamford Hospital as a consultant, and had consulted with physicians in the Stamford area, all prior to 1969. Dr. Andriole testified that he knew the standard of care ordinarily exercised by both physicians and internists in the care and treatment of shock in both the Stamford area and throughout the state of Connecticut, and that the standard of care was the same for each.

William C. Shoemaker is a surgeon who lives in California and is licensed to practice in that state and in New York, Massachusetts, and Illinois, but he has never been licensed to practice in Connecticut. He is a full professor of medicine at Mount Sinai Medical School in New York City, a position he held in January, 1969. Dr. Shoemaker has specialized in the care and treatment of shock throughout his career. His experience in Connecticut prior to 1969 was limited to two days spent visiting at Hartford Hospital, and conversations and consultations with physicians from the Stamford area. Dr. Shoemaker testified that he was familiar with the standard of care, skill and diligence ordinarily

exercised by physicians and surgeons in the general neighborhood of New York City in the care, diagnosis and treatment of shock as of January 8, 1969. He was also familiar with the same standards for the general neighborhood of Stamford. He also testified that there was a national standard of care for the treatment of shock throughout the United States as of January 8, 1969.

Joseph Rovinsky was, at the time of trial, a professor of obstetrics and gynecology at the Health Sciences Center of the State University of New York at Stonybrook and also chairman of the department of obstetrics and gynecology at the Long Island Jewish Medical Center at Hillside, Queens, New York. On January 8, 1969, he was an associate professor of the Mount Sinai School of Medicine in New York. He is licensed to practice in New York, Pennsylvania and California, but not in Connecticut. During 1967 and 1968, Dr. Rovinsky served as an examiner for the American Board of Obstetrics and Gynecology and, in this capacity, examined seventy or eighty doctors applying for certification over the two-year period. These seventy or eighty applicants included doctors practicing in Connecticut. Dr. Rovinsky testified that, based on this experience, he was able to form a conclusion as to the standard of practice in the state of Connecticut.

The purpose to be served by, and the need for, expert testimony in a medical malpractice case has recently been restated by this court. "The standard of care to be exercised by a physician in diagnosis and treatment, and thus the scale by which courts and juries weigh malpractice claims, is well established. 'A physician is under a duty to his patient to exercise that degree of care, skill and diligence

which physicians in the same general neighborhood and in the same general line of practice ordinarily possess and exercise in like cases.' *Snyder* v. *Pantaleo,* 143 Conn. 290, 292, 122 A.2d 21; *Horton* v. *Vickers,* 142 Conn. 105, 113, 111 A.2d 675; *Marchlewski* v. *Casella,* 141 Conn. 377, 380, 106 A.2d 466; *Ardoline* v. *Keegan,* 140 Conn. 552, 556, 102 A.2d 352. Further, the necessity for expert testimony as to this standard is also well established. 'Usually, proof of the breach of this duty must rest upon the testimony of an expert witness qualified to state what the particular standard of care requires and to express an opinion that the treatment accorded the patient failed to meet this standard.' *Snyder* v. *Pantaleo,* supra." *Fitzmaurice* v. *Flynn,* 167 Conn. 609, 616, 356 A.2d 887. The defendants argue that the four witnesses called by the plaintiff were not qualified to testify as experts with regard to the standard of practice involved in this case, and have advanced three grounds in support of their argument.

First, the defendants contend that since none of the four witnesses had actually practiced in Stamford and two (Drs. Rovinsky and Shoemaker) had not even practiced in Connecticut, the four were not qualified to testify as to the standard of care in the "general neighborhood" of Stamford. In so arguing, the defendants have overlooked our holding that, in determining the qualifications of a witness to testify concerning the standards of practice in a given neighborhood, the "crucial question" is not whether the witness has practiced in the neighborhood but "whether he knows what those standards are." *Ardoline* v. *Keegan,* 140 Conn. 552, 557, 102 A.2d 352. As a practical matter, it would seem that in most cases an expert would not be familiar with

the standards of practice in a given neighborhood unless he had actually practiced there. The four witnesses called by the plaintiff in this case, however, all testified that they did in fact know the standard of care in the Stamford area as of January 8, 1969. Drs. Kase and Andriole had actually practiced in the general neighborhood of Stamford, as we have defined that general neighborhood to include the entire state of Connecticut. *Fitzmaurice* v. *Flynn,* supra; *Geraty* v. *Kaufman,* 115 Conn. 563, 574, 162 A. 33. Dr. Rovinsky testified that he was familiar with the standard of care in Connecticut and Stamford through his experience as an examiner for the American Board of Obstetrics and Gynecology. Dr. Shoemaker testified that he was familiar with the standards of practice in New York City, and thus in Stamford, since previous testimony had established that the standards in the two areas were the same. See *Ardoline* v. *Keegan,* supra, 557. All four witnesses were therefore qualified to testify concerning the standards of practice in the general neighborhood of Stamford.

The defendants also argue that the experts were not qualified to testify concerning the standard of care to be expected of physicians in the "same general line of practice" as the defendants, because the defendants and the experts did not all specialize in the same medical field. In *Fitzmaurice* v. *Flynn,* supra, p. 618, we specifically held that a proposed expert need not practice the same specialty as the defendants. "Recognizing the complexity of knowledge required in the various medical specialties, more than a casual familiarity with the specialty of the defendant physician is required. The witness must demonstrate a knowledge acquired from experience or study of the standards of the specialty of

the defendant physician sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards, and not to the standards of the witness' particular specialty if it differs from that of the defendant. It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." The plaintiff presented evidence at trial that the care and treatment of shock fell within the field of all medical specialties and that the minimum standard for the care and treatment of shock was common to all specialties. It was, therefore, not necessary that the plaintiff's witnesses be of the same specialty as the defendants.

The defendants' third ground for objecting to the qualifications of the plaintiff's experts is that, unlike the defendants, the four experts were either associated with large teaching hospitals or practiced in a large metropolitan area. The defendants argue that permitting such witnesses to testify places the defendant doctors at a serious disadvantage, especially in light of General Statutes § 52-159a, which prevents the defendants from knowing the names of the plaintiff's proposed experts before trial, and in view of a tendency, real or imagined, for jurors to give greater credence to the testimony of experts who travel long distances to testify. The defendants argue that permitting such experts to testify is analogous to judging the efforts of small-town attorneys by the standards of practice prevailing in large New York City law firms or at the Yale Law School. This argument, though interesting, loses sight of the basic rule that an expert, in order to testify, must first qualify by demonstrating a knowledge of the

particular neighborhood standards for a particular line of practice. In this case, all four of the plaintiff's experts testified as to the standard of practice in the general neighborhood of Stamford, and not as to the standards of practice prevailing at Yale Medical School or in the most sophisticated medical circles in New York City.

" 'The determination of the qualification of an expert is largely a matter for the discretion of the trial court.' *Coffin* v. *Laskau,* 89 Conn. 325, 329, 94 A. 370; *Oborski* v. *New Haven Gas Co.,* 151 Conn. 274, 280, 197 A.2d 73. The trial court's decision is not to be disturbed on appeal 'unless that discretion has been abused, or the error is clear and involves a misconception of the law.' 31 Am. Jur. 2d 531, Expert and Opinion Evidence, § 31." *Siladi* v. *McNamara,* 164 Conn. 510, 513, 325 A.2d 277; *Nash* v. *Hunt,* 166 Conn. 418, 425, 352 A.2d 773; see *State* v. *Castagna,* 170 Conn. 80, 89, 364 A.2d 200. We cannot say that the trial court abused its discretion by permitting the plaintiff's experts to testify.

## II

As part of their defense, the defendants called Gilles Allard, the pathologist who performed the autopsy. He testified that the uterine artery which had ruptured was very weak due to a rare medical condition from which Mrs. Katsetos suffered and which had weakened the cells of the artery. He also testified that owing to the weakened condition of the artery, it would not have been possible to stop the bleeding by suturing or clamping the artery.[1]

---

[1] The defendants claim that the weakening of the artery had in fact caused the internal bleeding which resulted in Mrs. Katsetos' death and that, even if the bleeding had been discovered, it would have been impossible to stop the bleeding by suture or clamp, and Mrs. Katsetos would have died in any event. It should be noted

While performing the autopsy, Dr. Allard had taken microscopic sections of the artery, and these were placed on slides suitable for projection. The defendants offered eighteen of these slides in evidence as aids to Dr. Allard in his testimony. After the court viewed two of the slides in the absence of the jury, it concluded that showing them to the jury would only tend to confuse them, and add nothing of value to the testimony of the pathologist. Although the defendants persisted in their attempt to have the slides shown to the jury, the court adhered to its original ruling excluding the slides. In support of its ruling, the court indicated that the slides were not very clear and were so complicated as to be confusing to the jury. The court also explained that the jury could better comprehend a word picture of what the pathologist found. Thereafter the pathologist proceeded to testify in great detail as to his pathological findings and conclusions.

The question of the admissibility of a photograph or a pictorial representation is a preliminary one for the trial court to determine. *Harris* v. *Ansonia,* 73 Conn. 359, 363, 364, 47 A. 672. Evidence of this character may be admitted if, in the opinion of the court, it will assist the jury in understanding the testimony, and the photograph or pictorial representation fairly represents what it purports to represent. *Gillette* v. *Schroeder,* 133 Conn. 682, 684, 54 A.2d 498; *Crowell* v. *Middletown Savings Bank,* 122 Conn. 362, 370, 189 A. 172. The trial court has discretion in determining whether such evidence,

that the plaintiff did not claim that the bleeding had been caused by any malfeasance on the defendants' part. He did claim that the defendants had negligently failed to discover the bleeding and remedy it. Evidence was introduced that the bleeding could have been stopped by procedures other than suture or clamp, such as by performing a hysterectomy.

which may be logically probative of a fact in issue, ought to be received. *Rosenstein* v. *Fair Haven & W.R. Co.,* 78 Conn. 29, 34, 60 A. 1061; see *Johnson* v. *Toscano,* 144 Conn. 582, 593, 136 A.2d 341; *Thibodeau* v. *Connecticut Co.,* 139 Conn. 9, 14, 89 A.2d 223. Such evidence should be excluded when it would confuse rather than aid the jury. *State* v. *Blyden,* 165 Conn. 522, 531, 338 A.2d 484; *Harris* v. *Ansonia,* supra, 363; 32 C.J.S., Evidence, § 709.

The trial court did not abuse its discretion in excluding the slides under the circumstances. Furthermore, in view of the subsequent testimony of the pathologist pertaining to the subject matter of the slides, a pictorial description added to the pathologist's verbal description would have been cumulative and not needed. 3 Wigmore, Evidence (Chadbourn Rev.) § 792, p. 238; see *Sitnik* v. *National Propane Corporation,* 151 Conn. 62, 66, 193 A.2d 503; *Guhring* v. *Gumpper,* 117 Conn. 548, 552, 169 A. 189.

### III

The defendants claim that the plaintiff's experts were improperly allowed to utilize the autopsy report as a basis for their testimony. The autopsy report, which was introduced without objection, reveals that the death of Mrs. Katsetos was caused by internal bleeding. The brief of the defendants discusses this claim in a general way but does not, as required by Practice Book § 631A, include the pertinent question or questions involved, the objections and the grounds on which based, as well as the answers, if any, the rulings and any exceptions taken. Although no finding is now required in jury cases; Practice Book § 629A; it is impossible to review such rulings without the inclusion of such particulars in the appellants' brief. See *Vachon* v.

*Ives,* 150 Conn. 452, 454, 190 A.2d 601. Because of the failure of the appellants to comply with Practice Book § 631A we do not consider their general claim with reference to use of the autopsy report which was properly admitted.

## IV

The defendants also claim that the court erred in refusing to permit Dr. Nolan to testify concerning his efforts to obtain permission to have an autopsy performed. In the absence of the jury, Dr. Nolan testified that on the night following Mrs. Katsetos' death, he requested permission to perform an autopsy from her husband (the plaintiff) but was refused. Dr. Nolan then contacted the medical examiner for permission, which was again refused. Finally, permission was obtained from the third party contacted by Dr. Nolan. The plaintiff objected that the offered testimony was not germane to the issues, and the court sustained the objection.

The defendants claimed at the trial that "the jury should know how the autopsy came about," arguing that "it shows the rarity of the type of condition from which Mrs. Katsetos suffered" and that "we never would have been in this courtroom . . . unless a doctor's request for autopsy had been undertaken, because nobody could have proven what she died of without an autopsy." In their brief, the defendants further argue that Dr. Nolan's efforts to obtain an autopsy were evidence of his lack of bias or prejudice, and also his desire to keep abreast of the latest developments in his field.

The trial court has a wide discretion as to questions of relevancy and remoteness in its rulings on evidence. *State* v. *Blyden,* 165 Conn. 522, 531, 338 A.2d 484; *State* v. *Pascucci,* 164 Conn. 69, 70–71,

316 A.2d 750; Holden & Daly, Connecticut Evidence § 67 (d). "No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason and judicial experience." *Federated Department Stores, Inc.* v. *Board of Tax Review,* 162 Conn. 77, 83, 291 A.2d 715. The trial court must determine in its discretion "when matter, although probative, by reason of remoteness, cumulative nature, or other cause so lacks significance or materiality as to justify its exclusion." *Bjorkman* v. *Newington,* 113 Conn. 181, 187, 154 A. 346. There was evidence before the jury that the defendants did not know the cause of death until the autopsy was done. The pathologist testified extensively as to the autopsy findings and as to the rarity of Mrs. Katsetos' condition. Under the circumstances the court did not abuse its discretion in sustaining the objection to the introduction of testimony pertaining to an act of the defendant Dr. Nolan after the death of Mrs. Katsetos. The basic issue was the condition and proper diagnosis and treatment of Mrs. Katsetos while she was alive.

## V

Both of the defendants filed requests to charge the jury on the question of different schools of thought in the medical profession. See *Geraty* v. *Kaufman,* 115 Conn. 563, 571, 162 A. 33, and *Force* v. *Gregory,* 63 Conn. 167, 170, 27 A. 1116, holding that where there are distinct and different schools of thought a physician is to be judged only by the practice of his own school of thought. See also 61 Am. Jur. 2d, Physicians, Surgeons, Etc., § 113; Prosser, Torts (3d Ed.) § 32, p. 163. The court refused to include the requested charge in its instructions to the jury, and exceptions were taken.

The court commented that, in its opinion, there was no testimony as to the treatment which would have been given Mrs. Katsetos by a different school of practice and that the requested charge was unnecessary. An examination of the transcript reveals that two of the plaintiff's expert witnesses had stated, on cross-examination, that there were different schools of thought concerning the care and treatment of certain aspects of shock. There was no evidence, however, that the defendants had treated Mrs. Katsetos in accordance with a school of thought different from that to which the plaintiff's experts belonged. In fact, the evidence reveals that the defendants did not follow any particular school of thought in treating her for shock because they were uncertain as to what had caused the shock. Moreover, expert testimony had established that, although the treatment of shock was in some respects controversial as of January 8, 1969, the basic procedures in treating shock were well established and had not been followed in the treatment of Mrs. Katsetos. The trial court did not err in refusing to charge as requested.

## VI

The defendants also have claimed error in the court's charge concerning a physician's duty to remain with a patient in a critical condition.[2] An exception was taken to this portion of the charge

---

[2] The court charged the jury, in part, as follows:

"I charge you that a physician is under the duty to give his patient all the necessary and continued attention and constant attendance as long as the case requires and that he should not leave his patient at a critical stage without giving reasonable notice and/or making suitable arrangements for the attendance of another physician specifically qualified to treat the patient for the particular problem presented, and the physician's failure to observe that professional obligation is culpable dereliction."

on the ground that it did not represent the law of this state, particularly in light of the use of the words "culpable dereliction." Claims of error addressed to the charge are now tested not only by the pleadings but also by the evidence relevant to the claimed error as printed in narrative form in the briefs of the parties. Practice Book §§ 631A, 632A; *Faiman* v. *James D. Kauffman, Inc.*, 140 Conn. 395, 396, 100 A.2d 842. Both the pleadings and the evidence raise the issue of care of the decedent at the critical stage. There is evidence that when Mrs. Katsetos was in a critical condition Dr. Nolan left her to treat six patients at his office and was not present in the hospital at various crucial times. There is also evidence that Dr. Weed was absent from the patient at various critical times.

We have not previously had occasion to consider the duty of a physician to remain in attendance upon a patient in critical condition. We now follow the general rule that in the absence of an emergency or special circumstances "a physician is under the duty to give his patient all necessary and continued attention as long as the case requires it, and that he should not leave his patient at a critical stage without giving reasonable notice or making suitable arrangements for the attendance of another physician." *Johnson* v. *Vaughn*, 370 S.W.2d 591, 596 (Ky.); annot., 57 A.L.R.2d § 3, pp. 379, 388; 70 C.J.S., Physicians and Surgeons, § 48, p. 966; see *Miller* v. *Dore*, 154 Me. 363, 367, 148 A.2d 692; 1 Wright, Connecticut Jury Instructions (2d Ed.) § 124 (hh), (ii), (jj). In each case the further question arises as to whether a failure to observe such duty is a proximate cause of any injury to the patient. *Green* v. *Stone*, 119 Conn. 300, 305, 176 A. 123. In using the exact language from other cases,

*Johnson* v. *Vaughn,* supra, and *Miller* v. *Dore,* supra, that "failure to observe that professional obligation is culpable dereliction," the court did not commit error. The court made clear to the jury in its charge as a whole that both a violation of that duty and proximate cause were both necessary for a recovery against the defendants. *Ramonas* v. *Zucker,* 163 Conn. 142, 149, 302 A.2d 242.

## VII

The defendants also claim error in the court's charge concerning mental suffering, including fear of death.[3] The defendants excepted to this portion of the charge on the ground that there was no evidence that the plaintiff's decedent had any fear of death or realized that she was going to die. The evidence reveals that Mrs. Katsetos was conscious, though in a state of shock, from 9:45 a.m. until she lapsed into a coma at 1:45 or 2 p.m. While conscious, she complained of pain, cramps, and nausea. A number of therapeutic measures were undertaken while she was still conscious. She had also experienced three prior deliveries and may well have been aware that her recovery was not proceeding in the usual manner. The pain, therapeutic measures, and unusual procedures may well have resulted in an apprehension of death. Compare *Fairbanks* v. *State,* 143 Conn. 653, 660, 124 A.2d 893. A trial court does not err in submitting to the jury any

---

[3] The court charged the jury, in part, as follows:

"A person injured by the wrongdoing of another is just as much entitled to be compensated for mental suffering caused thereby as for the physical suffering, including the fear that death will result. Hence, I instruct you that mental suffering is as proper an element of damages as is physical suffering. You are to consider in this connection the fear of death and the physical circumstances in which the plaintiff's decedent found herself and whether or not such a fear might properly have been experienced."

issue of fact within the pleadings which is reasonably supported by the facts proven or reasonably inferred from the evidence. *Strong* v. *Carrier,* 116 Conn. 262, 263, 164 A. 501; Maltbie, Conn. App. Proc. § 72. The jury upon the evidence could reasonably have inferred that the decedent suffered mental anguish because of the apprehension of death. *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714; *McCoy* v. *Raucci,* 156 Conn. 115, 122, 239 A.2d 689; *Fairbanks* v. *State,* supra; *Chase* v. *Fitzgerald,* 132 Conn. 461, 471, 45 A.2d 789; see *Bushnell* v. *Bushnell,* 103 Conn. 583, 594, 131 A. 432.

## VIII

Finally, the defendants claim that the verdict is excessive. On a motion to set aside the verdict, the trial court found that "the jury's verdict was well within the reasonable total of allowable damages for a death" and rejected the defendants' claim that it was excessive. The trial court's refusal to set aside the verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness. *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770; *Neal* v. *Shiels, Inc.,* 166 Conn. 3, 19, 347 A.2d 102. The test is "whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." *Raia* v. *Topehius,* 165 Conn. 231, 239, 332 A.2d 93. See also 22 Am. Jur. 2d, Death, § 178. On appeal, the conclusion of the trial court from the vantage point of the trial bench cannot be disturbed unless the court abused its discretion. *Birgel* v. *Heintz,* 163 Conn. 23, 27, 301 A.2d 249; *Fairbanks* v. *State,* supra, 661.

In actions for injuries resulting in death, a plaintiff is entitled to "just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses." General Statutes § 52-555. "Just damages" include (1) the value of the decedent's lost earning capacity less deductions for her necessary living expenses and taking into consideration that a present cash payment will be made,[4] (2) compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived, and (3) compensation for conscious pain and suffering. *Chase* v. *Fitzgerald,* supra, 470-71; *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 669-71, 136 A.2d 918; see *Feldman* v. *Allegheny Airlines, Inc.,* 524 F.2d 384 (2d Cir.). It has been stated that our rule for assessing damages in death cases gives no precise mathematical formulas for the jury to apply; *Floyd* v. *Fruit Industries, Inc.,* supra, 676; *Szela* v. *Johnson Motor Lines, Inc.,* 145 Conn. 714, 718, 146 A.2d 910; *Lane* v. *United Electric Light & Water Co.,* 90 Conn. 35, 37, 96 A. 155; and that the assessment of damages in wrongful death actions "must of necessity represent a crude monetary forecast of how the decedent's life would have evolved." *Feldman* v. *Allegheny Airlines, Inc.,* supra, 386; see also *Intelisano* v. *Greenwell,* 155 Conn. 436, 443, 232 A.2d 490.

The verdict was general and we have no means of determining to what extent inflation and the depreciated value of the dollar were taken into

---

[4] "[I]n measuring a person's actual loss from a permanent and total destruction of earning capacity, whether by death or injury, there is an important factor which must be offset against probable net earnings. That factor is any saving in income tax liability which can properly be attributed to a cessation of earned income." *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 671, 136 A.2d 918.

account by the jury. See *Quednau* v. *Langrish,* 144 Conn. 706, 714, 137 A.2d 544; 2 Harper & James, Torts § 25.11. As Judge Henry J. Friendly reflected, "there are few who do not regard some degree of continuing inflation as here to stay." *McWeeney* v. *New York, N.H. & H.R. Co.,* 282 F.2d 34, 38 (2d Cir.), cert. denied, 364 U.S. 870, 81 S. Ct. 115, 5 L. Ed. 2d 93. Since the defendants do not challenge the court's charge relating to damages, we assume that it was adequate and legally correct. *Vogel* v. *Sylvester,* 148 Conn. 666, 668, 174 A.2d 122. Comparison of verdicts is of little value. "No one life is like any other, and the damages for the destruction of one furnish no fixed standard for others." *Fairbanks* v. *State,* 143 Conn. 653, 661, 124 A.2d 893.

There was evidence from which the jury could have found that the decedent was 41 years of age at the time of her death and had a life expectancy of about 32 years. She was happily married and had four children including the child born on the day of her death. She was a very happy person and in good health before the delivery of her last child. She was a dedicated mother and homemaker and active in many outside activities. She was a state-licensed hairdresser and also had experience in office work. In 1962, she and her husband established a pizza business where she worked until she temporarily discontinued work because of her pregnancy. The above is just a brief recital of some of the facts brought before the jury, as stated in the plaintiff's brief, with appropriate references to pages of the transcript of evidence.

The defendants argue that the verdict constitutes an award of an annuity of at least $20,000 a year and that it is excessive when one considers that the

best indication of a possible salary for the plaintiff's decedent, if she ever returned to hairdressing, was $125 a week plus tips and that any wages that she would have earned in the pizza business were limited. The defendants' argument takes into consideration only an evaluation of the destruction of the decedent's earning capacity and gives no consideration to the award of an amount based on the destruction of the capacity to carry on life's activities, as well as compensation for conscious pain and suffering. See *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770; *Chase* v. *Fitzgerald,* 132 Conn. 461, 470, 45 A.2d 789.

Although the award of damages was liberal, it cannot be held as a matter of law that the trial court abused its discretion in refusing to set aside the verdict.

There is no error.

In this opinion the other judges concurred.