Ellenette POLOZIE, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. H–89–202 (JAC).

United States District Court,
D. Connecticut.

Oct. 4, 1993.

---

Matthew Auger, Suisman, Shapiro, Wool, Brennan & Gray, New London, CT, for plaintiff.

William A. Collier, Leslie Cayer Ohta, U.S. Attys. Office, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION

SMITH, United States Magistrate Judge.

This malpractice action was brought on April 5, 1989, against the government based on the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.*, for injuries allegedly suffered by the plaintiff as a result of medical treatment she received from the United States Navy. Actions brought under the FTCA must be tried to the Court, and, pursuant to 28 U.S.C. § 636(c), the parties consented to try the case before a Magistrate Judge (filing # 77), electing to take any appeal in the case to the United States court of appeals. The case was tried to the Court September 20 to 24, 1993, the parties stipulating that there were no special damages. On the basis of the credible evidence adduced at trial, the Court finds that judgment must enter in favor of the defendant United States of America. Pursuant to Fed.R.Civ.P. 52, the Court's findings of fact and conclusions of law follow.

### I. Background

This action arises out of medical treatment received by the plaintiff from Dr. Maura Kennedy, a physician who at all relevant times was employed by the United States Navy at the U.S. Submarine Base Hospital in Groton, Connecticut. The plaintiff, Ellenette Polozie, was a civilian dependant of her daughter, who was an ensign in the United States Navy. On September 21, 1987, the plaintiff met with Dr. Kennedy for a routine medical examination. At the time, the plaintiff was seventy-two-years-old and suffered from atrial fibrillation, diabetes, hypertension, and the valvular heart disease mitral valve stenosis. The plaintiff was taking several prescription drugs to combat these conditions and their potential physiological effects. One of the drugs she was taking was Coumadin.

Physicians prescribe Coumadin to counter the natural effects of mitral stenosis and atrial fibrillation. The combination of these particular conditions render the patient prone to clotting in the heart.[1] A local blood clot, or thrombus, can break away from the wall of the heart and travel through the patient's blood stream. When this happens the thrombus, now called an embolus, can lodge in a vessel and cause a blockage. This can result in severe injury and even death. To combat this danger, the patient takes a blood thinning agent, or anticoagulant, to keep the blood from clotting in the heart.[2] Coumadin is an anticoagulant, and the plaintiff had been on a dosage of 2.5 milligrams per day since the drug was first prescribed in 1982.

Although Coumadin is useful in preventing the formation of emboli, the drug is extremely dangerous. Because anticoagulants halt the natural clotting action of the blood, the patient is not only prone to bleed more if injured, but the Coumadin itself may cause bleeding in any tissue or organ of the body. Thus, the need for anticoagulation must be balanced against the serious risk the drug poses to the well-being of the patient. Physicians are able to monitor the effect of the drug on the body by measuring the clotting time of the blood (the prothrombin time) and thus are able to keep the dosage in a set therapeutic range of times. The plaintiff's therapeutic range of prothrombin times was 16–20.

Two days after the plaintiff's initial visit, the plaintiff returned to Dr. Kennedy. Dur-

---

1. Mitral valve stenosis involves a scarring and narrowing of the mitral valve, which impedes the blood flow. This causes a backup of blood, which, in turn, causes a backup of pressure in the heart. The condition caused the plaintiff's left atrium to stretch and become enlarged, which caused the atrium to quiver. This atrial fibrillation and the valvular disease combine to cause a stagnation of the blood in the heart, which may lead to the formation of blood clots.

2. Coumadin has no effect on clots which have already formed; it can only prevent preexisting clots from getting larger.

ing this visit, the doctor became aware of the fact that the plaintiff's latest prothrombin time, 15.9, was slightly lower than normal. Dr. Kennedy thought that the plaintiff's care had not been aggressive enough and decided to take a more aggressive approach to treatment. Thus, in order to bring the time up, Dr. Kennedy increased the dosage from 2.5 mg to 2.5 mg alternating with 5.0 mg. It was established at trial that this represented a fifty percent increase of the patient's dosage. Dr. Kennedy instructed the plaintiff to have her prothrombin time tested· in one week. During this same visit Dr. Kennedy reduced the level of another drug the plaintiff was taking (digoxin). The reduction of the dosage of this drug evidently had an adverse effect on the plaintiff, for she returned to the doctor on September 29, 1987, and complained that the reduction of the dosage of digoxin caused shortness of breath and an accelerated heart rate. Dr. Kennedy restored the dosage of digoxin to the previous level.

On October 5, 1987, the plaintiff returned to Dr. Kennedy's office in order to be examined after a fall in which she had injured her shoulder. At this visit, Dr. Kennedy noted that the plaintiff's prothrombin time was extremely high (38.9), and informed the plaintiff to discontinue taking the Coumadin. Dr. Kennedy examined the plaintiff again on October 7 and recorded a further increase in the prothrombin time to 41. On October 8 Dr. Kennedy again examined the plaintiff, who had come to the Naval Hospital complaining of a severe headache, which had started the day before, and a stiff neck. At this time, Dr. Kennedy became concerned that the plaintiff had suffered an intracranial hemorrhage, and she referred the plaintiff to a neurologist for radiological testing. Virtually all of the witnesses at trial agreed that the prothrombin time of 41 was markedly high and that the plaintiff was over-anticoagulated at this point.

The plaintiff was admitted to the William H. Backus Hospital in Norwich on October 8. While at the hospital the plaintiff received care to counteract the anticoagulated state of her blood. Later that day, Backus transferred the plaintiff to the Yale–New Haven Medical Center for further treatment and observation. At that time, the plaintiff was in a semi-comatose state. When she awoke her left side was not functioning, and she required physical therapy in order to regain the use of her left side. Even with the aid of a walker and a three-legged cain the plaintiff had a difficult time recovering the ability to walk. Yale–New Haven discharged the plaintiff on October 24, 1987. Upon her return home the plaintiff had to continue physical therapy. She could not be left alone because of her propensity to fall down, so her daughter's family took care of her. Fortunately, in a few months the plaintiff was able to make a substantial recovery. Nevertheless, she alleges that she suffered permanent damage as a result of the incident.

According to the plaintiff, the defendant United States, through its agent Dr. Kennedy, was negligent in its treatment of the plaintiff in that Dr. Kennedy:

(1) increased the plaintiff's dosage of coumadin without adequate investigation of the plaintiff's history, including an assessment of her diet, her sensitivity to Coumadin, and her medical history;

(2) failed to monitor the plaintiff's condition after increasing her dose of a very dangerous drug; and

(3) failed to diagnose and treat the plaintiff's over-anticoagulated condition.

The plaintiff alleges that she suffered an intracranial subarachnoid hemorrhage as a direct consequence of this negligence, which resulted in her suffering damages. According to the expert testimony of neuroradiologist Dr. James Abrahams, the plaintiff's condition was brought about by a spontaneous bleed into an area of the brain called the sylvian fissure. The blood then irritated the muscle fibre surrounding the arteries in this area of the brain and caused the vessels to contract (a phenomenon called vasospasm). The contraction of the vessels then caused blood flow to halt, and a blockage, or occlusion, resulted.

Whenever an area of the brain is deprived of blood, the cells in the area die. A region of cells so affected is called an infarction. This entire process results in a cerebral vascular disease commonly referred to as stroke.

The resulting damage is irreparable, and, according to neurologist Dr. Lawrence Brass, only 10% of the survivors of a stroke can return to a normal life with no symptoms. Fortunately, the plaintiff's ailment did not cause extensive, long-term damage.

The defendant denies that the plaintiff's injuries were caused by her over-anticoagulated state. Instead, according to the defendant, the hemorrhage was caused by an aneurism—a weakening in the wall of a blood vessel which allowed blood to leak into the area around the brain. In the alternative, the defendant argues that the plaintiff's stroke was caused by the very event she was being medicated to prevent—an embolus which traveled from her heart to a point in her brain where it blocked an artery. This formed a bland infarct that later became hemorrhagic, which accounts for the bleeding.

## II. The Testimony of Dr. Chyatte

During her stay at Yale–New Haven Hospital the plaintiff was cared for by neurologist Dr. Douglas Chyatte. At the time of trial Dr. Chyatte was not within the subpoena power of the Court, and the plaintiff represented to the Court that the doctor was unwilling to travel to the District of Connecticut to testify at trial. Based on the unavailability of Dr. Chyatte, the plaintiff sought to admit his deposition into evidence.

Hearsay, inadmissible under the Federal Rules, may be introduced into evidence if it qualifies under special statutory exceptions. Fed.R.Evid. 802. Plaintiff moved that the deposition be admitted under the former testimony exception to the hearsay rule. Fed.R.Evid. 804(b)(1). In order to utilize this provision of the Federal Rules, a proponent must first demonstrate that the witness was unavailable. Fed.R.Evid. 804(a). In this case, Dr. Chyatte was unavailable within the meaning of the Rule because he was "absent

from the hearing and the proponent has been unable to procure the declarant's attendance ... by process or other reasonable means." Fed.R.Evid. 804(a). Having met this requirement, Rule 804(b)(1) states that former testimony is admissible if it is:

testimony given as a witness at ... a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

The deposition, although hearsay, was potentially admissible under Fed.R.Evid. 804 as well as Fed.R.Civ.P. 32(a)(3)(B).[3] *See United States v. International Business Machines Corp.*, 90 F.R.D. 377, 384 (S.D.N.Y. 1981) (Fed.R.Evid. 804 and Fed.R.Civ.P. 32 are independent methods of admitting depositions). Under both of these rules, however, the admission of deposition testimony lies in the sound discretion of the trial court. *In re Air Crash Disaster at Stapleton International Airport*, 720 F.Supp. 1493, 1502 (D.Colo. 1989) (citing cases). In the present case, the defendant objected to the plaintiff's offer, and the Court ruled that the deposition transcript was inadmissible on fairness grounds after making an explicit factual finding on the record.

Just as the text of Rule 804 suggests it would be unfair for one party to be held to the litigation strategy of another party in a previous proceeding unless the motive to develop the testimony was sufficiently similar, the Court in this case held that it would be unfair for the defendant to be bound at trial by the strategy it employed in examining an expert witness during a discovery deposition taken at a time when it was expected that the witness would be available to testify at trial.

---

**3.** The relevant portion of Rule 32(a) states:

At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:

....

(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... (B) that the witness is at a greater distance than 100 miles from the place of trial or hearing....

The admissibility of the former testimony turns on the issue of whether a "similar motive" existed at the taking of the deposition as would exist at trial. The standard for examining this question was announced recently by the Second Circuit:

The text of the "similar motive" requirement of rule

804(b)(1) inherently requires a comparison between what the examiner's motive was at the time of the prior testimony and what it would be if the witness was actually "available" at the current proceeding.

*United States v. Salerno,* 974 F.2d 231 (2d Cir.1992). Under this test, admitting the transcript of Chyatte's deposition testimony into evidence would have been unfairly prejudicial and clear error.

■ In deposing Dr. Chyatte, the defendant's motive was to gather information and, generally, to learn as much as it could about Chyatte's opinions and their bases. It was not the defendant's motive at that point to test Chyatte's methodology or to challenge his skill, credibility, and confidence in his own assessments. The defendant's motive for cross-examination at trial was entirely different. Had Dr. Chyatte testified at trial, he would have been subjected to a highly competent and challenging cross-examination which was dramatically different from the one he experienced at the deposition. While Dr. Chyatte may have withstood this questioning, it is equally conceivable that he would have wilted under the government's skilled cross-examination, as did Dr. Korr. To have admitted the transcript in these circumstances would have clothed Chyatte's testimony in an undeserved aura of invulnerability.

The Rule 30 analysis is similar. This was not a case where the party against whom the deposition was offered failed to examine the deponent at the deposition and thereby assumed the risk that the deposition might be introduced at trial. *See, e.g., Hendrix v. Raybestos–Manhattan, Inc.,* 776 F.2d 1492 (11th Cir.1985). Rather, the defendant examined Dr. Chyatte, but in an incomplete fashion and in a manner totally inconsistent with the goals of examination at trial. The Court had no difficulty admitting the deposed

testimony of one of the defendant's experts, Dr. Tse, but this was a *de bene esse* deposition and not a discovery deposition. Attorneys presumably know what the purpose of a trial deposition is, and they will be mindful of the fact that they will not have another chance to develop fully the testimony of the witness. In cases involving expert testimony this is particularly the case, and the Court must bear in mind that after taking a discovery deposition the attorney fully expects to examine the expert witness again at trial. The Court finds that in this case it would be unfair to hold the attorney to the method used in the discovery deposition to explore the issues.

### III. Opinion

■ A case brought under the Federal Tort Claims Act must be resolved according to the law of the place where the negligence is alleged to have occurred. 28 U.S.C. § 1346(b). Because the government is answerable to the extent a private individual would be liable in similar circumstances, the Court looks to whatever law the state court would apply in like circumstances involving a private defendant. *See Caban v. United States,* 728 F.2d 68, 72 (2d Cir.1984); *Harrison v. United States,* 479 F.Supp. 529, 532 (D.Conn.1979) (Clarie, J.). In this case, since the malpractice is alleged to have taken place in Connecticut, Connecticut law governs.

■ The elements of a cause of action for negligence are duty, breach, actual and proximate causation, and damages. *Doe v. Manheimer,* 212 Conn. 748, 563 A.2d 699, 702 (1989); *Coste v. Riverside Motors, Inc.,* 24 Conn.App. 109, 585 A.2d 1263, 1265 (1991). The existence of a duty is a question of law. Once it is established that a duty exists, the question of whether the duty has been violated is a question of fact. *Behlman v. Universal Travel Agency, Inc.,* 4 Conn.App. 688, 496 A.2d 962, 964 (1985).

■ There is no doubt that the defendant owed the plaintiff a duty of care. As a physician, Dr. Kennedy was under a duty to exercise that degree of care, skill and diligence which physicians in the same general line of practice ordinarily exercise in similar cases. *See Cross v. Huttenlocher,* 185 Conn.

390, 440 A.2d 952, 954 (1981); *Katsetos v. Nolan,* 170 Conn. 637, 368 A.2d 172, 177 (1976); *Ardoline v. Keegan,* 140 Conn. 552, 102 A.2d 352, 355 (1954). The burden is on the plaintiff to prove the extent of the standard of care, as well as that the defendant's conduct did not meet the standard. *Cross,* 440 A.2d at 954; *Pisel v. Stamford Hospital,* 180 Conn. 314, 430 A.2d 1, 12 (1980); *Fitzmaurice v. Flynn,* 167 Conn. 609, 356 A.2d 887 (1975). In medical malpractice cases this evidence must be established through the expert testimony. *Cross,* 440 A.2d at 954; *Pisel,* 430 A.2d at 12; *Katsetos,* 368 A.2d at 177; *see also Todd v. Malafronte,* 3 Conn. App. 16, 484 A.2d 463, 466 (1984) (although in ordinary action for negligence the jury can apply the standard of care, this does not apply in action where laymen cannot be expected to know requirements of proper care); *but see Perez v. Mt. Sinai Hospital,* 7 Conn. App. 514, 509 A.2d 552, 556 (1986) (expert testimony not required when such a gross want of care is established so as to give an almost conclusive inference of negligence).

■ In the case at bar, expert testimony was required to aid the finder of fact in setting the level of care required, and also to establish whether a breach of the standard of care had in fact occurred. Unfortunately for the plaintiff, not only did she fail to carry her burden of proving these elements by a preponderance of the evidence, but she also failed to present any credible testimony on the subject. The sole expert to testify on this matter, cardiologist Dr. Kenneth Korr, did in fact testify that in his medical opinion it was a breach of the standard of care to: (1) increase the plaintiff's dosage of Coumadin without exploring more thoroughly plaintiff's history; (2) fail to monitor more closely the plaintiff's condition following the increase; and (3) fail to treat the plaintiff's over-anticoagulated state when the plaintiff later presented herself to the doctor with a highly increased prothrombin time.

On cross examination, however, Dr. Korr recanted most, if not all, of the relevant testimony he gave on direct examination. Noting the importance of Coumadin to a cardiac patient's therapy, indeed to her life, Dr. Korr retreated from the opinion he gave earlier concerning the increase in dosage. He then reevaluated the second basis for finding Dr. Kennedy negligent, and stated that asking the patient to return in one week was not a breach of the standard of care. Finally, on the third finding of fault with Dr. Kennedy's treatment, Dr. Korr held fast to his opinion that it was a breach of the standard of care to not begin reversal of the over-anticoagulation by October 7. Nevertheless, Dr. Korr could not testify that there would have been a substantial difference in result if the Vitamin K therapy was administered on the 7th instead of the 8th. Thus, the plaintiff's expert evidence on whether there was a breach of the standard of care at any point in the treatment of the plaintiff is at best weak.

In sharp contrast, the testimony of neurologist Dr. Lawrence Brass and cardiologist Dr. Lawrence Cohen, and, to a lesser extent, Doctors James Donaldson and Phillip Dickey, was confident and persuasive. Each of these witnesses rendered his expert opinion that there was no breach of the standard of care in increasing the dosage of Coumadin; that there was no breach in the monitoring of the patient following the increase; and, finally, that there was no breach of the standard of care in failing to administer corrective therapy. In such a situation it would be impossible for a lay person to conclude that Dr. Kennedy breached the standard of care.

The Court agrees with the opinion of Dr. Abrahams and finds that it was more likely than not that the plaintiff's injury was caused by a subarachnoid hemorrhage brought on by the overdose of Coumadin and that it was not due to an aneurism or an embolic infarct. The Court further finds that the plaintiff's condition was iatrogenic—that is, it was brought about by the treatment given to her by her physician. With the perfect vision of hindsight, the Court can say that Dr. Kennedy erred in increasing the plaintiff's dosage of this dangerous drug. Nevertheless, Coumadin is used by physicians to keep their patients alive, and physicians must necessarily balance the risk of embolic stroke against the dangers of Coumadin. Anticoagulation in patients with mitral valve stenosis and atrial fibrillation is reasonably used to pre-

vent the otherwise high incidence of embolism. The standards of practice relating to the use of the drug set by the medical profession must be observed in this Court, and there was no credible testimony that Dr. Kennedy violated the standard of care at any point in her treatment of the plaintiff.

The Court also finds that the plaintiff suffered physical and neuropsychological damage as a consequence of this hemorrhage, but, because of the foregoing analysis, the value of these damages need not be ascertained. The plaintiff has suffered damages, but they are *damnum absque injuria*—a loss which does not give rise to an action.

Having failed to prove that Dr. Kennedy's treatment violated the standard of care, and thus that there was a breach of a duty, the plaintiff cannot prevail in a negligence action. Therefore, judgment on the complaint shall enter in favor of the defendant.