0698

Cyrus Donald JOHNSTON, Executor of the Estate of Valerie Broadwell Johnston, Deceased, Appellant v. William F. WARD, Jr., M.D., Penrod G. Hepfer, M.D., and The South Carolina Baptist Hospital, Respondents.

(344 S. E. (2d) 166)

Court of Appeals

*Charles L. Henshaw, Jr., of Law Offices of O. Fayrell Furr, Jr.,* Columbia, *for appellant.*

*Charles E. Baker* and *Jackson L. Barwick, Jr., of Belser, Baker, Barwick, Ravenel, Toal & Bender, Heyward E. McDonald, of Rogers, McDonald, McKenzie, Fuller & Rubin,* and *Ernest J. Nauful, Jr., of Nauful & Ellis,* Columbia, *for respondents.*

Heard Feb. 24, 1986.

Decided May 5, 1986.

GOOLSBY, Judge:

These wrongful death and survival actions brought by Cyrus Donald Johnston, Executor of the Estate of Valerie Broadwell Johnston, deceased, against William F. Ward, Jr., M.D., Penrod G. Hepfer, M.D., and the South Carolina Baptist Hospital involve allegations of medical malpractice. Johnston appeals from verdicts in favor of Dr. Ward, Dr. Hepfer, and Baptist Hospital.

The issues on appeal relate to (1) the denial of a motion to compel disclosure of investigative reports compiled by an insurance adjuster and submitted to an expert witness, (2) the admission of expert testimony regarding the responsibility of a physician taking calls for another physician, (3) the refusal to permit cross-examination of an expert witness as to testimony given by the witness in a deposition in prior litigation and as to the witness's relationship with one of the attorneys involved in the trial of the case, (4) the denial of motions for mistrial because of questions asked by counsel concerning the existence of life insurance and the economic impact of remarriage, (5) the refusal of a request to charge

the doctrine of last clear chance and to include a special verdict question concerning the doctrine, and (6) the refusal to strike the defense of assumption of risk and the giving of jury instructions and the inclusion of a special verdict question concerning the defense.

We affirm.

At 5:15 a.m. on March 22, 1979, Johnston found his wife Valerie collapsed, but conscious, in the hallway of their home. Valerie told Johnston, "I took my pills." Johnston immediately called for an ambulance.

After the ambulance arrived, Johnston gave the ambulance personnel three empty bottles that he found on the kitchen counter. The bottles had contained Trilafon, Tofranil PM, and Artane, prescription drugs Valerie had been taking for about eight years.

Valerie told an ambulance attendant that she had "doubled up" on her medication. He asked her whether that was all the medication she had taken and she said that it was. Valerie made no mention of aspirin products.

At Johnston's insistence, the ambulance attendants took Valerie to the emergency room of the Baptist Hospital. They arrived about 6:00 a.m.

Once at the emergency room, Valerie told a nurse that at 10:00 p.m. the night before she had taken a "handful" of Trilafon and Tofranil PM tablets.

Dr. Ward, the emergency room physician, began examining Valerie around 6:30 a.m. He found her depressed, able to ask and answer simple questions, and oriented as to "time, person, and place." She did not manifest any pain, tenderness, or nausea.

Valerie told Dr. Ward that she had taken "about 20" pills. She also denied having taken anything other than the prescription drugs.

Based on her history, including what she had related to Johnston, the ambulance attendant, and emergency room nurse, Dr. Ward concluded that Valerie had taken an overdose of Trilafon and Tofranil PM. He neither induced Valerie to vomit nor pumped out her stomach, choosing instead to follow what he described as the "observation approach."

At 6:45 a.m., Dr. Ward telephoned Dr. Hepfer at his home. Dr. Hepfer had treated Valerie since 1971 for depression and

anxiety. He agreed with Dr. Ward that Valerie should be sent to the hospital's psychiatric floor. He also agreed to take responsibility for her.

On admitting Valerie to the psychiatric floor, Dr. Ward gave orders that Valerie have "complete bed rest" and that "suicidal precautions" be taken.

After being placed on the psychiatric floor, Valerie admitted to having taken an overdose of her prescription medication and again denied having taken anything else.

A nurse on the psychiatric floor checked Valerie every fifteen minutes from 6:45 a.m. until 3:15 p.m., when her shift ended. She found Valerie alert and coherent. Other hospital personnel were in and out of Valerie's room all morning long.

Johnston and his daughter also visited Valerie. They came around mid-day and talked with her.

Instead of coming to the hospital, Dr. Hepfer left a message for Dr. Charles Blain Baber, III, to see Valerie for him. Dr. Baber, who was handling calls for Dr. Hepfer that morning, looked in on Valerie around 10:00 a.m. Although Dr. Baber did not awaken her, he did check her general condition.

Dr. Hepfer called the hospital at 11:30 a.m. and inquired about Valerie. A nurse told him that Dr. Baber had seen Valerie earlier. He asked the nurse to determine from Valerie whether she wanted him to come in and see her that day. The nurse conferred with Valerie and reported to Dr. Hepfer that Valerie said she was "just a little sleepy" and that she would see Dr. Hepfer the next day.

At 4:45 p.m., a nurse found Valerie "exhibiting some mild seizure activity." Her body was "twitching." She was also "hyperventilating" and "unresponsive to staff's questions." The nurse called and left a message for Dr. Baber. He returned the call at 6:10 p.m.

Between 6:10 and 7:05 p.m., Johnston returned to the hospital bringing with him 21 BC powder wrappings that he found in a trash can at home. BC powder is a form of aspirin, which contains salicylate.

Upon receiving this new information from Johnston, the nurses on duty again called Dr. Baber. At 7:05 p.m., a salicylate level blood test was ordered to be performed on Valerie.

The test results were reported at 8:10 p.m. They showed a lethal salicylate level. Valerie was immediately transferred to the intensive care unit.

Valerie, however, became comatose that night. She died at 8:00 a.m. the next morning of salicylate overdose.

These actions followed. They were consolidated for trial. After nine days of testimony, the trial court submitted the cases to the jury using in each case a special verdict form on all material issues.

In both cases, the jury found that Dr. Ward was negligent but that Dr. Hepfer and the hospital were not negligent. The jury found Dr. Ward, Dr. Hepfer, and the hospital were neither reckless nor grossly negligent. The jury also found that Valerie was contributorily negligent and that she assumed the risk.

The trial court directed verdicts in favor of Dr. Ward, Dr. Hepfer, and Baptist Hospital based on the findings of the jury as expressed by the special verdict forms.

## I.

Johnston contends the trial court committed reversible error in refusing to allow his counsel to examine documents compiled by an insurance adjuster and submitted to a medical expert later called as a witness for Dr. Ward and the other respondents.

Prior to trial and during the deposition of Dr. Donald O. Allen, a defense expert, Johnston's attorney learned that Dr. Allen had been provided with investigative reports prepared by an adjuster for the Southeastern Joint Underwriting Association, the respondents' insurance carrier. After counsel for the respondents refused to allow examination of these documents, Johnston's attorney moved to compel their production.

The Honorable A. Lee Chandler, then a Circuit Judge and now a Supreme Court Justice, conducted a hearing on Johnston's motion and entered an order denying it. He held, after inspecting the documents in camera, that none of the undisclosed information contained in the reports was relevant to the formulation of Dr. Allen's opinion, that Johnston had not satisfied the good cause requirement of Circuit Court Rule 88, and that the reports constituted attorney work-

product and thus were not discoverable under *Hickman v. Taylor*, 329 U. S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947).

A trial court's rulings in matters involving discovery will not be disturbed on appeal absent a clear showing of an abuse of discretion. *Hook v. Rothstein*, 281 S. C. 541, 316 S. E. (2d) 690 (Ct. App. 1984), *cert. denied*, 283 S. C. 64, 320 S. E. (2d) 35 (1984). Johnston made no such showing.

Circuit Court Rule 88, which, as of July 1, 1985, was repealed and replaced by Rule 34 of the new South Carolina Rules of Civil Procedure [*see* S. C. R. CIV. P. 34, 85(c), and 86], allowed a party, upon a showing of good cause, to obtain through court order "any designated documents, papers, books, ... which constitute or contain evidence relating to any of the matters within the scope of the oral examination permitted by the rule relating to depositions on oral examination...." The scope of the oral examination, as provided in Circuit Court Rule 87 B, which also was repealed and replaced as of July 1, 1985 [*see* S. C. R. CIV. P. 26(b), 85(c), and 86], extended to "any matter, not privileged, which is relevant to the subject matter involved in the pending action...."

It is clear, then, from a reading of former Rules 87 B and 88, that only relevant matter was discoverable. Indeed, the Supreme Court, in *South Carolina State Highway Dept. v. Booker*, 260 S. C. 245, 195 S. E. (2d) 615 (1973), indicated that relevancy is the first consideration in a determination of whether a party satisfied the "good cause" requirement of Rule 88.

Our own examination of the materials in question reveals that Johnston had access to or was provided with all the relevant information relied upon by Dr. Allen in forming his expert opinion. There was, then, no cause to give Johnston the other information or the documents containing the other information. Judge Chandler, therefore, committed no error in not giving Johnston access to the undisclosed portions of the reports. *Cf. Reed v. Tiffin Motor Homes, Inc.*, 697 F. (2d) 1192 (4th Cir. 1982) (where Court of Appeals held trial court properly sustained an objection to a question asked an expert about a report not used by the expert in formulating his opinion as to vehicle's speed).

Johnston argues that the Supreme Court's holding in *Booker, supra,* requires disclosure of the documents in question. We disagree. Unlike the materials at issue in *Booker,* which the Supreme Court ordered disclosed, the expert witness in the instant case did not utilize the sought-after materials as a basis for his expert opinion. Thus, the discovery of these documents by Johnston would not have shortened the trial, clarified the issues, eliminated surprise or accorded justice, all the considerations which, under *Booker,* meet the test of "good cause."

We do not reach the question of whether the materials in issue constituted attorney work-product.

II.

Johnston next argues that the trial court committed error in allowing Dr. Hepfer's psychiatrist expert, Robert N. Milling, M.D., to testify that, when an off-duty physician "has assigned responsibility to take care of his patient[s] [to] someone else, it is that person's responsibility to care for [the off-duty physician's] patients." Johnston claims this evidence was "irrelevant" because it conflicted with Dr. Hepfer's continuing obligation to provide medical care to Valerie.

We discern no conflict between Dr. Milling's testimony and the law applicable to these cases.

> Once employed, a physician must attend the case as long as it requires attention, unless the relation of physician and patient is ended by mutual consent or is revoked by the dismissal of the physician. 61 Am. Jur. (2d) *Physicians, Surgeons, and Other Healers* § 234 at 365 (1981). A physician cannot abandon a case without reasonable notice to the patient. D. HARNEY, MEDICAL MALPRACTICE § 1.3 at 10 (1973).

Nothing in the record here, however, suggests that Dr. Hepfer ever abandoned Valerie's case. Her care at all times remained under his personal direction, although he did not see Valerie himself but sent another psychiatrist to attend her.

> Where a physician for one reason or another is temporarily unable to attend the patient personally, the physician, without being viewed as having either

abandoned or neglected his patient, may make provision for a competent physician to attend the patient. *See Browning v. Hoffman,* 90 W. Va. 568, 111 S. E. 492 (1922). In the absence of negligence in making the substitution, the physician is not liable for injuries resulting from the substitute physician's want of skill or care unless the substitute physician is in his employ or is his agent or partner. 61 Am. Jur. (2d) *Physicians, Surgeons, and Other Healers* § 295 at 444 (1981); 70 C. J. S. *Physicians and Surgeons* § 54d at 978 (1951).

Here, Johnston makes no contention either that Dr. Hepfer negligently selected a substitute physician or that the substitute physician was in Dr. Hepfer's employ or was his agent or partner.

The trial court, therefore, committed no error in admitting the challenged testimony.

### III.

Johnston further complains about the trial court's placing of limitations on his cross-examination of Dr. Ward's emergency room expert, Dr. Charles D. Eskridge, III. The trial court would not allow Johnston to cross-examine the witness about his having given a deposition for Dr. Ward in a prior case and about the witness's relationship with one of Dr. Ward's attorneys.

Considerable latitude is generally allowed in the cross-examination of a witness for possible bias. *North Greenville College v. Sherman Construction Co., Inc.,* 270 S. C. 553, 243 S. E. (2d) 441 (1978). To warrant the reversal of a limitation placed on the scope of cross-examination by the trial court, the appellant must demonstrate both a manifest abuse of discretion amounting to an error of law and prejudice. *Vacation Time of Hilton Head Island, Inc. v. Lighthouse Realty, Inc.,* 286 S. C. 261, 332 S. E. (2d) 781 (Ct. App. 1985). He has done neither.

Cross-examination of Dr. Eskridge regarding his giving of a deposition for one of the parties in this case could well have led to a multiplication of issues and confusion of the minds of the jurors in an already lengthy and complicated trial. *See Polk v. State,* 62 Ala. 237 (1878); *In re Martin's Estate,* 170 Cal. 657, 151 P. 138 (1915). The trial court, therefore, committed no abuse of discretion in disallowing the inquiry.

Likewise, the refusal of the trial court to permit inquiry of Dr. Eskridge as to the relation of attorney and client between him and counsel for Dr. Ward to show bias of Dr. Eskridge against Johnston did not constitute an abuse of discretion. *Birmingham Southern Ry. Co. v. Lintner,* 141 Ala. 420, 38 So. 363 (1904).

Furthermore, Johnston suffered no prejudice. Dr. Eskridge's testimony was offered by Dr. Ward to establish the absence of negligence on his part. The jury obviously disbelieved Dr. Eskridge's testimony since the jury, in its special verdicts, expressly found Dr. Ward negligent in his treatment of Valerie.

## IV.

Johnston also contends the trial court erred in denying his motions for mistrial because of a question asked Valerie's employer concerning whether Valerie was covered by group life insurance and of a question asked Johnston's economic expert concerning whether the possibility of a surviving spouse's remarriage is taken into account when determining the economic loss resulting from the other spouse's death. In each instance, the witness answered the question. The trial court sustained objections to both questions and immediately gave curative instructions, telling the jury to disregard the answers.

A motion for a mistrial by reason of anything occurring during the trial of a case is addressed to the sound discretion of the trial judge, and his ruling upon the motion will not be disturbed unless there has been an abuse of discretion. *Epting v. Brumble,* 264 S. C. 114, 212 S. E. (2d) 711 (1975); *South Carolina State Highway Department v. Rural Land Co.,* 250 S. C. 12, 156 S. E. (2d) 333 (1967). We discern no abuse of discretion by the trial judge in denying Johnston's motions for mistrial.

The result we reach here is controlled by *McCrae v. McCoy,* 214 S. C. 343, 52 S. E. (2d) 408 (1949), a case involving the asking of questions known by counsel to be incompetent. There, the Supreme court stated:

The general rule is that where the jury is cautioned and instructed to disregard the incompetent testimony, the judgment will ordinarily not be reversed. Usually, it

is only where counsel persists in attempting to mislead and prejudice the jury by asking questions known to be out of order; or where a court of review can see that, notwithstanding the efforts of the presiding judge to remove the prejudicial effects of such conduct, an injury may have resulted to the other party, that a judgment should be reversed on that ground alone. Of course, where the damage done is ineradicable, the presence of good faith or inadvertence is of little moment. Necessarily, each case must be judged on its own facts and circumstances. . . .

214 S. C. at 346-47, 52 S. E. (2d) at 404-05.

Here, the record discloses that, after the trial judge ruled the testimony sought by each question to be inadmissible and told the jury to disregard each answer, counsel did not ask either question again. Also, the prejudicial effect of each question is not reflected in the record and does not appear to have influenced the jury's findings to any extent. Answers to both questions, if relevant at all, could only relate to damages, an issue which the jury did not reach.

A careful consideration of the issue leaves us unconvinced that the trial judge committed reversible error in not declaring a mistrial in either instance.

## V.

Johnston also contends the trial court erred in refusing his request to charge the doctrine of last clear chance and in not including a special verdict question in each case asking whether each of the defendants could have avoided the consequences of Valerie's contributory negligence. We disagree.

In South Carolina, a plaintiff cannot invoke the doctrine of last clear chance to avoid the preclusive effect of his own contributory negligence unless the complaint contains allegations that bring the case within the doctrine. *See Jackson v. Solomon*, 228 S. C. 225, 89 S. E. (2d) 436 (1955). Although the complaint need not refer to the doctrine of last clear chance by name, it must allege facts that show the doctrine is applicable and will be invoked. 65A C. J. S. *Negligence* § 191 at 384 (1966).

An essential element of the doctrine of last clear chance is knowledge and appreciation of the plain-

tiff's peril on the part of the defendant. 65A C. J. S. *Negligence* § 137(4) at 146 (1966); *see Jones v. Atlanta-Charlotte Air Line R. Co.*, 218 S. C. 537, 548, 63 S. E. (2d) 476, 480 (1951); *Scott v. Greenville Pharmacy, Inc.*, 212 S. C. 485, 493, 48 S. E. (2d) 324, 327-28 (1948). Johnston's amended complaints allege no facts showing that Dr. Ward, Dr. Hepfer, or Baptist Hospital either were aware of and appreciated or, in the exercise of ordinary care, should have known of and appreciated Valerie's peril of having taken an overdose of salicylates.

Since neither amended complaint alleges any factual basis that would allow application of the doctrine of last clear chance, the trial judge committed no error in refusing to charge the doctrine and in refusing to include in each case a special verdict question about it.

Even if the doctrine of last clear chance were adequately alleged in the amended complaints, an additional reason exists why the doctrine should not have been charged and made the subject in each case of a special verdict question. No evidence warranted either the charge or the question.

As our Supreme Court recently observed in *Brown v. George*, 278 S. C. 183, 294 S. E. (2d) 35 (1982), the doctrine of last clear chance is not applicable in every case where the defendant alleges the plaintiff was guilty of contributory negligence. The doctrine applies only where the plaintiff's antecedent negligence has become remote in the chain of causation and is but a mere condition of the plaintiff's injury. *Smith v. Blackwell*, 250 S. C. 170, 156 S. E. (2d) 867 (1967). "It does not apply where the plaintiff's act combines and concurs with the defendant's act as a proximate cause of the injury." *Brown v. George*, 278 S. C. at 185, 294 S. E. (2d) at 36. Before the doctrine can be applied, the plaintiff's negligence must have ceased to operate as a proximate cause of the injury while there was still time for the defendant's negligence to intervene. 65A C. J. S. *Negligence* § 139 at 168 (1966).

Here, the only reasonable inference to be drawn from all the evidence is that Valerie's negligent conduct in not informing the defendants while she was able to do so that she had ingested a massive amount of an aspirin product was not antecedent to any negligent act on the part

of any defendant. Rather, her negligence was concurring. Her negligent conduct continued until the defendants had no last clear chance to save her. Valerie's negligence failure to inform the defendants about taking the BC powders admits to only one conclusion: it contributed directly to her own death. *Rochester v. Katalan, M.D.*, 320 A. (2d) 704 (Del. 1974).

## VI.

Finally, Johnston contends the trial court erred in failing to strike the defense of assumption of risk, in instructing the jury concerning that defense, and in including on the special verdict forms the question, "Did Valerie Johnston, the deceased, assume the risk." We need not address these questions because whether or not the issue should have remained in the case and been submitted to the jury makes no difference now. *See Belk v. Belk*, 175 N. C. 69, 94 S. E. 726 (1917).

The jury expressly found that neither Dr. Hepfer nor Baptist Hospital was negligent in their treatment of Valerie but found Dr. Ward was so; however, the jury also found Valerie contributorily negligent. Johnston nowhere challenges these findings on appeal.

The issue of whether Valerie assumed the risk, then, is entirely immaterial and without proper significance in these cases. *See Poindexter v. Call*, 182 N. C. 366, 109 S. E. 26 (1921). Indeed, the question submitting the issue to the jury in each case and the jury's answer thereto may be disregarded without disturbing the judgments. *See Newberry v. Willis*, 195 N. C. 302, 142 S. E. 10 (1928).

As the case turned out, any error in the submission of the issue was harmless and, therefore, provides no basis for reversal. *See Key v. Woodlief*, 258 N. C. 291, 128 S. E. (2d) 567 (1962); *Poindexter v. Call, supra; cf. Graham v. Suggs*, 269 S. C. 627, 239 S. E. (2d) 644 (1977) (where evidence sustained the finding that defendant motorist was negligent, trial court committed no error in instructing the jury concerning the doctrine of last clear chance); *New Foundation Baptist Church v. Davis*, 257 S. C. 443, 186 S. E. (2d) 247 (1972)

(where no punitive damages awarded, the question of whether trial court properly submitted such issue became moot).

Affirmed.

CURETON, J., and LITTLEJOHN, Acting Judge, concur.