Martha JACKSON, Plaintiff–Appellant,

v.

OKLAHOMA MEMORIAL HOSPITAL,
Defendant,

Ivar K. Rossavik, M.D., Defendant–
Appellee.

No. 83924.

Supreme Court of Oklahoma.

Oct. 17, 1995.

Rehearing Denied Jan. 30, 1996.

Mark L. Weimer, Stipe Law Firm, Oklahoma City, for Appellant.

John M. Perry III, Hilton H. Walters, Robert D. Hoisington, Perry, Rife, Walters & Sullivan, Oklahoma City, for Appellee.

OPALA, Justice.

Two issues are dispositive of this controversy: (1) Does the Governmental Tort Claims Act [GTCA][1] shield *faculty* physicians—who are teaching at Oklahoma Memorial Hospital [OMH]—from tort liability in *medical malpractice* suits brought against them in their status as state employees? and (2) Did the trial court err in giving summary judgment to the defendant faculty physician? We answer the *first* question in the *negative* and the *second* in the *affirmative.*

I

**THE ANATOMY OF LITIGATION**

Martha Jackson [Jackson] received a cautery burn to her lower abdomen during a hysterectomy[2] performed at

---

**1.** 51 O.S.1991 §§ 151 et seq.

**2.** A hysterectomy is an abdominal operation involving the removal of the uterus. DORLAND'S

OMH[3] on September 9, 1991. Dr. Ivar K. Rossavik [Rossavik or physician] was the attending and supervising faculty physician for Jackson's treatment. The surgery itself was allegedly performed by resident physicians who are not parties to this action.

Jackson brought this medical malpractice action against Rossavik and OMH. Because she was anesthetized during the procedure, her lawsuit tenders for judicial consideration the *res ipsa loquitur*[4] pattern of proof. Summary judgment went to the physician on some but not all of the theories pressed.[5] The nisi prius judgment was grounded on the ruling that, *as a matter of law*, (1) GTCA-conferred immunity protects the physician from tort liability, (2) the physician was *not* negligent and (3) his conduct did not cause the injury. Jackson appealed from summary judgment, first urging as error only the last two grounds. *By her first amended petition in error she added the first ground as a third basis for summary judgment's reversal.*

■■■■ Rossavik moved to strike Jackson's first amended petition, urging that because the appeal had been placed on the accelerated docket Jackson should not be able to add a new and different issue to those which were tendered earlier.[6]

■ *The unavailability of immunity to shield the physician from liability for the tort in suit is a plainly preserved issue for our review in this case.* A party may amend the petition in error at any time before the brief in chief is filed "to include any error or any issue presented to and resolved by the trial court which is supported by the record."[7] Moreover, Jackson's petition in error stands amended by her brief in chief.[8] Both at nisi prius and now (in her amended petition in error and brief) Jackson's position has been that the *GTCA does not confer immunity upon a physician for negligence occurring in the delivery of health-care services.* The trial court's ruling on immunity could also be reached *sua sponte.* It is a point of *public law* raised at nisi prius, which, if critical to our consideration or disposition *of a timely-filed appeal* and supported by the record, is reviewable in an appellate court even if not explicitly invoked.[9] Whenever urgent interest demands an immediate resolution of some *vital public-law issue*, no impediment arising from infirmity in the procedural posture of the case—however well recognized in *purely private litigation*—will bar our exercise of reviewing powers.[10]

---

ILLUSTRATED MEDICAL DICTIONARY at 812 (28th Ed., W.B. Sanders Co., Phila.1994).

**3.** "Oklahoma Memorial Hospital" existed under that name for only thirteen years. *See* 56 O.S.Supp.1980 § 401 (adopting the title "Oklahoma Memorial Hospital" effective July 1, 1980); 63 O.S.Supp.1993 § 3202.1 (reinstating the prior name of "University Hospital" effective July 1, 1993).

**4.** For the definition of *res ipsa loquitur*, see *infra* note 15.

**5.** At nisi prius Rossavik pressed as a ground for summary relief that Jackson failed to comply with the GTCA notice provisions. When he withdrew that ground from judicial consideration, the trial court overruled that portion of his motion.

**6.** For the accelerated docket (fast track) procedure, see Rule 1.203, Rules on Perfecting a Civil Appeal, 12 O.S.1991, Ch. 15, App. 2.

**7.** Rule 1.17(a), Rules on Perfecting a Civil Appeal, 12 O.S.1991, Ch. 15, App. 2.; *Markwell v.*

*Whinery's Real Estate*, Okl., 869 P.2d 840, 843 (1994).

**8.** Rule 1.17, *supra* note 7; *Markwell, supra* note 7 at 843.

**9.** *North Side State Bank v. County Com'rs*, Okl., 894 P.2d 1046, 1050 n. 8 (1994); *Schulte Oil Co. v. Oklahoma Tax Com'n*, Okl., 882 P.2d 65, 69 n. 8 (1994); *Strelecki v. Oklahoma Tax Com'n*, Okl., 872 P.2d 910, 919 n. 66 (1993); *Simpson v. Dixon*, Okl., 853 P.2d 176, 187 n. 55 (1993); *In the Matter of McNeely*, Okl., 734 P.2d 1294, 1296 (1987); *Reynolds v. Special Indem. Fund*, Okl., 725 P.2d 1265, 1270 (1986); *Davis v. Davis*, Okl., 708 P.2d 1102, 1104 n. 2 (1985); *Burdick v. Independent School Dist.*, Okl., 702 P.2d 48, 54 n. 10 (1985); *McCracken v. City of Lawton*, Okl., 648 P.2d 18, 21 n. 11 (1982); *Application of Goodwin*, Okl., 597 P.2d 762, 764 (1979); *Special Indemnity Fund v. Reynolds*, 199 Okl. 570, 188 P.2d 841, 842 (1948).

**10.** *Goodwin, supra* note 9 at 764; *Barks v. Young*, Okl., 564 P.2d 228, 229 (1977); *Payne v. Jones*, 193 Okl. 609, 146 P.2d 113, 116 (1944); *Special Indemnity Fund v. Reynolds, supra* note 9, 188 P.2d at 842.

## II

### THE GTCA DOES *NOT* CONFER IMMU-NITY UPON A PHYSICIAN FOR NEGLIGENCE OCCURRING IN THE DELIVERY OF HEALTH–CARE SERVICES

■ This court's pronouncement in *Anderson v. Eichner*[11] is dispositive of the issue pressed by the defendant physician for the summary judgment's affirmance on the basis of GTCA-conferred immunity. *Anderson*, which construes the 1986 and 1989 versions of the GTCA, holds that faculty physicians engaged in teaching or in administrative duties (and resident physicians as well as interns participating in a graduate medical education program) are employees of the state acting within the scope of their employment *except when they are practising medicine.*[12] *In short, the purview of protection from liability created by the GTCA*[13] *does not encompass the practice of the healing art by providing medical or surgical services to patients.*[14]

Under the authority and rationale of *Anderson*, that portion of the summary judgment for the defendant physician, which was grounded on GTCA-conferred immunity, *must hence be reversed. We so hold.*

11. Okl., 890 P.2d 1329 (1994).

12. The pertinent terms of 51 O.S.1991 § 152(5) (eff. Sept. 1, 1991), which were in force when the claim arose, *provided:*

"5. 'Employee' means any person who is authorized to act in behalf of a political subdivision or the state whether that person is acting on a permanent or temporary basis, with or without being compensated or on a full-time or part-time basis.
Employee also includes:
a. all elected or appointed officers, members of governing bodies and other persons designated to act for an agency or political subdivision, but the term does not mean a person or other legal entity while acting in the capacity of an independent contractor or an employee of an independent contractor,

\* \* \* \* \* \*

For the purpose of this act, the following are employees of this state, regardless of the place in this state where duties as employees are performed:
a. *physicians* acting in an administrative capacity,

## III

### SUMMARY PROCESS OF ADJUDICATION ANALYZED IN THE CONTEXT OF THE INVOKED *RES IPSA LOQUITUR* PATTERN OF PROOF

Jackson urges the trial court erred by giving summary judgment to Rossavik based on its ruling, as a matter of law, that the physician was not negligent and his conduct did not cause the injury. According to Jackson, summary relief was inappropriate because she had established the foundation facts for invoking the *res ipsa loquitur* pattern of proof. She submits that whether the physician had *exclusive control or management* of the cautery during surgery presents a question of fact for jury resolution. According to Rossavik, Jackson's claim must fail because the uncontradicted evidentiary material in the record *shows that no negligence* was involved in the inflicted burn and that his actions were consistent with the hospital-prescribed standard of care. The physician argues that Jackson is not entitled to the benefit of *res ipsa loquitur* because she *failed to establish two critical foundation facts*—that the cautery was in his exclusive possession and that her injury is one which does not ordinarily occur absent negligence.

b. *resident physicians* and *resident interns participating in a graduate medical education program* of the University of Oklahoma Health Sciences Center or the College of Osteopathic Medicine of Oklahoma State University,
c. faculty members and staff of the University of Oklahoma Health Sciences Center and the College of Osteopathic Medicine of Oklahoma State University, while engaged in teaching duties.
*Physician faculty members and staff of the University of Oklahoma Health Sciences Center* and the College of Osteopathic Medicine of Oklahoma State University *not acting in an administrative capacity or engaged in teaching duties are not employees or agents of the state.* However, in no event shall the state be held liable for the tortious conduct of any physician, resident physician or intern while practicing medicine or providing medical treatment to patients." (Emphasis added.)
The 1992, 1993 and 1994 *amendments have no effect on this litigation.*

13. 51 O.S.1991 §§ 151 et seq.

14. *Anderson, supra* note 11 at 1340–1341.

## A.

### Res Ipsa Loquitur Pattern Of Proof Was Properly Invoked

 *Res ipsa loquitur*[15] is a pattern of proof which may be applied when an injury is alleged to have been negligently inflicted and the harm is shown *not to occur* in the usual course of everyday conduct unless a person who controls the instrumentality likely to have produced that harm fails to exercise due care to prevent its occurrence.[16] Once the foundation facts for *res ipsa loquitur*[17] are established, negligence may be inferred from the injurious occurrence without the aid of circumstances pointing to the responsible cause. *The burden of producing evidence* (but not the ultimate burden of persuasion)[18] *is then shifted to the defendant.*[19] *Whether res ipsa loquitur may be applied to a cause*

**15.** The Latin phrase *"res ipsa loquitur"* ("the things speaks for itself") had its origin in a statement by Erle, C.J., in *Scott v. London and St. Katherine's Docks Co.*, Ex. Ch., 3 H & C 596, 601, 159 Eng.Rep. 665, 667 (1865):

"There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such, as in the ordinary course of things, that it does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

*See* Cooke & Oughton, COMMON LAW OF OBLIGATIONS 180 (Butterworths 1993). The evidentiary doctrine was introduced by Baron Pollock in an 1863 English case where a barrel of flour rolled out a warehouse window and fell upon a pedestrian. *Byrne v. Boadle*, 2 H & C 722, 159 Eng. Rep. 299 (1863). *See also Hake v. George Wiedemann Brewing Co.*, 23 Ohio St.2d 65, 262 N.E.2d 703 (1970) (decided on substantially identical facts).

**16.** *Qualls v. U.S. Elevator Corp.*, Okl., 863 P.2d 457, 460 (1993); *Thompson v. Presbyterian Hospital*, Okl., 652 P.2d 260, 265 (1982). The purpose of the *res ipsa loquitur* pattern of proof is to aid a plaintiff in making out a prima facie case of negligence in circumstances where direct proof of why the harm happened is beyond the power or knowledge of the plaintiff. *Turney v. Anspaugh*, Okl., 581 P.2d 1301, 1304 (1978); *St. John's Hospital & School of Nursing v. Chapman*, Okl., 434 P.2d 160, 162 (syl. 1), 166–167 (1967).

**17.** The *foundation facts* to be shown are: (a) an injury that does not occur in the usual course of everyday conduct; (b) the defendant(s) exclusively controlled the instrumentality that caused the injury; (c) evidence of the true explanation for the harm's occurrence is more accessible to the defendant than to the plaintiff; and (d) the circumstances surrounding the harmful event are not likely to produce an injury unless the defendant fails to exercise due care to prevent its occurrence. *Qualls, supra* note 16 at 460; *Thompson, supra* note 16 at 265; *Turney, supra* note 16 at 1304; *Martin v. Stratton*, Okl., 515 P.2d 1366, 1370 (1973); *Holland v. Stacy*, Okl., 496 P.2d 1180, 1183 (1972); *St. John's, supra* note 16 at 166–167.

**18.** For many years the term "burden of proof" was ambiguous, because the term was used to describe two distinct concepts. Burden of proof was frequently used to refer to what is now called the burden of persuasion—the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose. But the term was also used to refer to what is now called the burden of production—a party's obligation to come forward with evidence to support its claim. *Director, OWCP v. Greenwich Collieries*, —— U.S. ——, ——–——, 114 S.Ct. 2251, 2255–2256, 129 L.Ed.2d 221 (1994) (citing J. Thayer, Evidence at the Common Law 355–384 (1898) (detailing various uses of the term burden of proof among 19th-century English and American courts)). In 1923 the Supreme Court of the United States noted that the distinction between "the burden of proof" and "the necessity of producing evidence to meet that already produced ... is now very generally accepted, although often blurred by careless speech." *Hill v. Smith*, 260 U.S. 592, 594, 43 S.Ct. 219, 219–20, 67 L.Ed. 419 (1923). In the two decades after *Hill*, U.S. Supreme Court jurisprudence consistently distinguished between *burden of proof*, which it defined as burden of persuasion, and *burden of production* (or the burden of going forward with the evidence). *Greenwich, supra* at ——, 114 S.Ct. at 2256. During the same period the U.S. Courts of Appeals also limited the meaning of burden of proof to burden of persuasion, and explicitly distinguished this concept from the burden of production. *Greenwich, supra* at ——, n. ***, 114 S.Ct. at 2256, n. *** (citing *Lee v. State Bank & Trust Co.*, 38 F.2d 45, 48 (2d Cir.1930); *Commissioner v. Bain Peanut Co.*, 134 F.2d 853, 860, n. 2 (5th Cir.1943)).

**19.** *Qualls, supra* note 16 at 460; *Thompson, supra* note 16 at 265; *Turney, supra* note 16 at 1304. *See also Hoven v. Kelble*, 79 Wis.2d 444, 256 N.W.2d 379, 381 (1977) (quoting *Szafranski v. Radetzky*, 31 Wis.2d 119, 141 N.W.2d 902, 908 (1966)), where the court notes:

"'... The doctrine of res ipsa loquitur is, of course, not a rule of pleading but a doctrine from the *law of evidence* that permits an inference of the defendant's negligence without any direct testimony as to his conduct at the very time such negligence occurred.'" (Emphasis supplied.)

*presents a question of law.* It is for the court to determine whether a given set of circumstances will allow an inference of negligence.[20] In the context of health-care litigation, *res ipsa loquitur* may be *applied* in suits against physicians and hospitals [21] *upon proof of the foundation elements,* but negligence can never be *presumed* from showing no more than unsuccessful treatment of a patient.[22]

It is unnecessary to analyze this cause in terms of our *legislation,* 76 O.S.1991 § 21,[23] which raises "a presumption of *negligence.*" Jackson brought herself clearly within the *common-law parameters* of the doctrine. No more is required by statute than by the common law *to bring* a case within the purview of *res ipsa loquitur.*[24] The statutory law's constitutional infirmity, if indeed present, need not be tested in this appeal. Constitutional questions are not decided in advance of strict necessity.[25] When measured by the applicable standards of the common and statutory law, Jackson clearly is entitled to rely on the evidentiary pattern she invoked for application to this action.

Jackson's evidentiary material establishes a physician-patient relationship. She directs us to (a) the June 8, 1991 memorandum from the Department of Obstetrics and Gynecology to the Resident and Faculty Staff, which identifies the *responsibilities of an attending physician,*[26] (b) the OMH Operating Room Log and Nursing Notes, on which Rossavik's name has been handwritten after the word "attending," and (c) the typed "Operative Record" that was dictated by the chief resident physician and signed by Rossavik, which lists Rossavik as the *attending surgeon. Rossavik's evidentiary material is not inconsistent with a physician-patient status.* His affidavit states that on the day of surgery he was the "attending professor of medicine." He explains that his teaching responsibilities include supervision, *where nec-*

20. *Qualls, supra* note 16 at 460; *Thompson, supra* note 16 at 266; *Turney, supra* note 16 at 1304.

21. *St. John's, supra* note 16 at 168–169; *Turney, supra* note 16 at 1304. *St. John's* overruled extant jurisprudence holding that *res ipsa loquitur* does not apply to medical malpractice suits. *See Cooper v. McMurry,* 194 Okl. 241, 149 P.2d 330 syl. 2 (1944); *Hembree v. Von Keller,* 189 Okl. 439, 119 P.2d 74, 78 (1941).

22. *St. John's, supra* note 16 at 168; *Turney, supra* note 16 at 1304.

23. The terms of 76 O.S.1991 § 21 provide in pertinent part:
 "In any action arising from negligence in the rendering of medical care, *a presumption of negligence shall arise* if the following foundation facts are first established:
 1. The plaintiff sustained any injury;
 2. Said injury was proximately caused by an instrumentality solely within the control of the defendant or defendants; and
 3. Such injury does not ordinarily occur under the circumstances absent negligence on the part of the defendant. * * * *" (Emphasis supplied.)

24. After *St. John's (supra* note 16) promulgation, the legislature enacted a *statutory presumption of negligence* for certain medical malpractice suits. *See* Okl.Sess.L.1976, Ch. 44, § 5, effective April 8, 1976 (76 O.S.1991 § 21). For extant jurisprudence construing § 21, see *Middlebrook v. Imler, Tenny & Kugler, M.D.'s,* Okl., 713 P.2d 572 (1985); *Fleming v. Baptist General Convention,*

Okl., 742 P.2d 1087 (1987); *Sisson By and Through Allen v. Elkins,* Okl., 801 P.2d 722 (1990). Similar foundational elements for a presumption of negligence to arise in a medical malpractice action are in effect in other states. *See* Ill.Rev.Stat. ch. 735, para. 5/2–1113; La.Rev. Stat. 9:2794; Nev.Rev.Stat. § 41A.100; N.Y.Civ. Prac. § 3012–a; R.I.Gen.Laws § 9–19–33. Some states allow a presumption of negligence in more limited circumstances. *See* Fla.Stat. § 766.102(4); Tenn.Code § 29–26–115; Tex.Civ. Stat. art. 4590, § 7.01. Other states *disallow* a presumption of negligence for medical malpractice litigation. *See* Alaska Stat. § 09.55.540(b); N.H.Rev.Stat. 507–E:2.

25. *In re Snyder,* 472 U.S. 634, 642–643, 105 S.Ct. 2874, 2880, 86 L.Ed.2d 504 (1985); *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–502, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985); *I.N.S. v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Wright v. Grove Sun Newspaper Co.,* Okl., 873 P.2d 983, 990 n. 31 (1994); *In re Initiative Petition No. 347 State Question No. 639,* Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.,* Okl., 732 P.2d 466, 467 n. 3 (1987); *Schwartz v. Diehl,* Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety,* Okl., 543 P.2d 563, 564–565 (1975).

26. For the pertinent terms of the intra-hospital memorandum, see *infra* note 42.

essary, of the residents and interns in the planning and carrying out of *any* surgery. He gave Jackson a *pre-surgery examination* and *was present during the initial stages of the procedure.* Rossavik's brief in support of summary process states that "as the attending physician" he was aware Jackson was scheduled for surgery and he consulted with the resident physicians assigned to perform the procedure. *According to Rossavik, he did not himself perform the surgery and he denies that the hospital rules* [27] *(then in force) impose on him a duty personally to perform or oversee the procedure in contest.*

 *A licensed attending faculty physician*—who, as a member of a state medical school faculty, is charged with delivery of medical care to patients—performs much the same function as an attending physician at a private health-care facility.[28] When the attending faculty physician agrees to treat a patient, the created legal relationship is regarded as personal and confidential—one of doctor and patient. The physician becomes bound to exercise *ordinary care* in the delivery of health services.[29] The law's *ordinary care* comprises the physician's use of *best judgment* in the exercise of the employed skills. The patient may expect from the faculty physician the same attention and care that would be legally due from a private health-care facility and from a physician in private practice.[30] *An attending physician's legal relationship and obligation to the pa-*

tient cannot be altered by hospital guidelines.[31]

A patient placed under anesthesia preparatory to surgery relinquishes to the attending physician and to those who assist in the procedure all control over his/her body.[32] Jackson, who had been anesthetized, was unconscious in the operating room; she had no way of knowing what transpired during the critical period. Rossavik was both the *attending* physician and the *supervising licensed faculty medical practitioner* in attendance. When surgery began he was admittedly present along with two resident physicians. For purposes of summary process the unfolded scenario satisfies the *res ipsa loquitur* criteria by revealing that the defendant physician was in *exclusive control* of the harm-dealing instrumentality responsible for the injury in contest.

Jackson's evidentiary material laid before the nisi prius court foundation facts from which it could be inferred that the injury—a cautery burn to her abdomen in *an area away from the incision*—was one that does *not ordinarily occur* in the process of hysterectomy *in the absence of negligence* in the use of the appliance. She relies on Rossavik's answers to interrogatories showing that (a) the burn and scar are *not usually seen* after similar surgeries and that (b) the burn *is recognized* as a complication. These statements indicate Jackson's harm is not what generally occurs in connection with the surgical procedure that was to be performed.[33]

---

**27.** For the pertinent hospital rules, see *infra* note 42.

**28.** *James v. Jane*, 221 Va. 43, 282 S.E.2d 864, 867–868 (1980).

**29.** *Boyanton v. Reif*, Okl., 798 P.2d 603, 605 (1990).

**30.** *James, supra* note 28, 282 S.E.2d at 867–868.

**31.** *James, supra* note 28, 282 S.E.2d at 867–868.

**32.** *See, e.g., Beaudoin v. Watertown Memorial Hospital*, 32 Wis.2d 132, 145 N.W.2d 166, 169 (1966); *Schaffner v. Cumberland County Hosp. System*, 77 N.C.App. 689, 336 S.E.2d 116, 120 (1985).

**33.** Among unexpected consequences of an operation are injuries to a portion of the patient's body not involved in the medical or surgical procedure

and not previously ill, diseased or disabled. *Louisell & Williams, Res Ipsa Loquitur—Its Future in Medical Malpractice Cases*, 48 Calif.L.Rev. 252 (1960). *See, e.g., Graham v. Thompson*, 854 S.W.2d 797 (Mo.App.1993) (burn on right calf *from* surgery performed on top of patient's right foot); *Dalley v. Utah Valley Regional Medical Center*, 791 P.2d 193 (Utah 1990) (burn on leg *from* a caesarean section); *Hill v. Highland Hospital*, 142 A.D.2d 955, 530 N.Y.S.2d 381 (1988) (classic thermal burn on body in the course of surgery to remove blockage in artery of patient's leg); *Mack v. Lydia E. Hall Hospital*, 121 A.D.2d 431, 503 N.Y.S.2d 131 (1986) (burn on left thigh *from* surgical procedure for treatment of rectal cancer); *Schaffner, supra* note 32 (burn on hand *from* ear surgery); *Borghese v. Bartley*, 402 So.2d 475 (Fla.App.1981) (burn on leg *from* heart surgery); *Fox v. Cohen*, 160 Ga.App. 270, 287 S.E.2d 272 (1981) (two burns on back *from* tonsillectomy and adenoidectomy); *Wiles v. Myerly*, 210 N.W.2d 619 (Iowa 1973) (burn on buttocks

Because *nothing* in the record irrefutably *negates* the applicability of *res ipsa loquitur*, Jackson clearly met her probative initiative for *invoking the doctrine* in the context of summary process. The law then *shifted* to the defendant physician *the responsibility for producing evidentiary material* favorable to his legal position.

## B.

### The Record Of Summary Adjudication Process Shows Disputed Facts On Material Issues

■ Where *res ipsa loquitur* is applicable, the focus in summary process is *not on* facts a plaintiff *might* be able to prove at trial (i.e., sufficiency of evidence that could be adduced) but rather *on* whether, in light of the applicable pattern of proof which is a plaintiff's due under that doctrine, the evidentiary material as a whole (a) shows *undisputed facts* on some or all material issues and (b) will support *a single inference* in favor of a defendant-movant's quest for relief.[34] Summary adjudication process—a special procedural track to be conducted with the aid of *acceptable probative substitutes* [35]—is a *search for undisputed material fact issues* that may be resolved without forensic com-

bat. It is a method for identifying non-triable fact issues, not a device for defeating a litigant's right to trial by jury. Only that evidentiary material which *eliminates in toto some or all fact issues* will afford support for nisi prius application of summary process.

■ When in the course of summary process Jackson showed that she could rely at trial on *res ipsa loquitur,* the *burden of providing acceptable evidentiary substitutes* (to refute that doctrine's applicability or to show that despite its use there are no genuine fact issues to be tried) *shifted completely* to the defendant physician.[36] The record demonstrates that at the summary-process stage Rossavik failed to meet this burden of production.

## C.

### Negligence And Causation Factors

Summary disposition in the physician's favor is rested on the nisi prius ruling that, as a matter of law (a) the physician was not negligent (based upon his compliance with the hospital safety rules) and (b) his conduct did not cause the injury (based on his *absence from surgery* when the injury occurred). Since we have only scant evidentia-

---

*from* surgery in the chest and groin area); *Shoberg v. Kelly*, 1 Wash.App. 673, 463 P.2d 280 (1970) (punctured bladder *from* hysterectomy); *Beaudoin, supra* note 32 (burn on buttocks *from* vaginal operation); *Horner v. Northern Pacific Ben. Ass'n Hospitals*, 62 Wash.2d 351, 382 P.2d 518 (1963) (paralyzed arm *from* hysterectomy); *Frost v. Des Moines Still College of Osteo. & Surg.*, 248 Iowa 294, 79 N.W.2d 306 (1957) (burn on abdomen *from* back surgery).

34. *Buck's Sporting Goods v. First Nat. Bank*, Okl., 868 P.2d 693, 697–698 (1994); *Hadnot v. Shaw*, Okl., 826 P.2d 978, 984–985 (1992); *Martin v. Chapel, Wilkinson, Riggs and Abney*, Okl., 637 P.2d 81, 84 (1981). *See in this connection, Johnson v. Jones*, —— U.S. ——, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

35. "Acceptable probative substitutes" are those which may be used as "evidentiary materials" in the summary process of adjudication. *Seitsinger v. Dockum Pontiac Inc.*, Okl., 894 P.2d 1077, 1080–1081 (1995); *Davis v. Leitner*, Okl., 782 P.2d 924, 926–927 (1989).

36. Attractive nuisance and bailment cases are somewhat analogous to the burden shifting pro-

cess in a *res ipsa loquitur* case. [A] *Attractive nuisance*. At common law a child between the age of 7 and 14 presumptively lacks the capacity for contributory negligence. Because a child in that age bracket is presumptively incapable of negligence (and hence has no duty to show either appreciation or lack of appreciation of danger), the burden shifts to the defendant to show that there is no genuine controversy over whether the underage plaintiff possessed a level of human maturity which was on a par with adult persons of ordinary prudence. If the defendant fails, the attractive nuisance doctrine will apply; it is then for the jury to decide whether the child was capable of mature motivation. *Knowles v. Tripledee Drilling Co., Inc.*, Okl., 771 P.2d 208, 212 (1989) (Opala, V.C.J., concurring). [B] *Bailment*. Once the plaintiff has shown the delivery of property in good condition and its return in a damaged condition or its loss, the burden shifts to the defendant (bailee) to show some exonerating cause, consistent with due care, for the damage or loss in suit. *City of Enid v. Reeser*, Okl., 355 P.2d 407 syl. 1 (1960). *See also* Prosser and Keeton, THE LAW OF TORTS, § 38 at 239 (5th ed.1984).

ry material shedding light on the details of the surgical procedure in contest, the precise rubric of negligence to which lack of due care is ascribed—whether it be *patient abandonment* or *negligence in the supervision of resident physicians*—cannot be identified. When Jackson established that Rossavik was the attending physician for her surgical procedure and invoked *res ipsa loquitur*, the burden of showing (producing evidence) that his absence from surgery *constitutes in law* neither patient abandonment nor negligent want of supervision came to be shifted to the physician.

In the absence of an emergency or special circumstances a physician is generally under the duty to give a patient all necessary and continued attention as long as the case requires it.[37] A physician should not leave a patient at a critical stage without giving reasonable notice or making suitable arrangements for the attendance of another equally competent substitute.[38] Failure to observe that professional obligation may subject the physician to liability for patient abandonment.[39] Similarly, an attending faculty physician who is responsible for the supervision of residents and interns in the delivery of health-care services owes patients a duty of reasonable care in supervising the resident physicians.[40] Among factors that affect this standard of care are (a) the complexity of the medical or surgical procedure being carried out, (b) the level of training, skill, and knowledge the resident or intern possesses, and (c) any written guidelines and procedures prescribed by the health-care facility.[41] The summary process used here, which gave binding finality to an intra-hospital memorandum, *wrongly placed on Jackson a responsibility that was not hers—that of producing evidentiary material to demonstrate that, as a matter of law, Rossavik's presence in the operating room was necessary and his absence from it inconsistent with his duty of care.*

Rossavik relied upon an intra-hospital memorandum for the standard of care that governs faculty supervision of resident physicians and interns during surgery. He points to Rule 3 of that memorandum, which states that major surgery may be performed under the "supervision of the chief resident on the service and the attending" physician by licensed medical practitioners who are in their second and third year of training.[42] Accord-

**37.** *Johnston v. Ward*, 288 S.C. 603, 344 S.E.2d 166, 170–171 (1986); *Payton v. Weaver*, 131 Cal. App.3d 38, 45, 182 Cal.Rptr. 225, 229 (1982); *Katsetos v. Nolan*, 170 Conn. 637, 368 A.2d 172, 182 (1976); *Miller v. Greater Southeast Community Hospital*, 508 A.2d 927, 929 (D.C.App.1986); *Norton v. Hamilton*, 92 Ga.App. 727, 89 S.E.2d 809, 812 (1955); *Johnson v. Vaughn*, 370 S.W.2d 591, 596 (Ky.App.1963); *Capps v. Valk*, 189 Kan. 287, 369 P.2d 238, 240 (1962); *McGulpin v. Bessmer*, 241 Iowa 1119, 43 N.W.2d 121, 125 (1950); *Miller v. Dore*, 154 Me. 363, 148 A.2d 692, 695–696 (1959); *Reid v. Johnson*, 851 S.W.2d 120, 121–122 (Mo.App.1993).

**38.** *Johnston, supra* note 37, 344 S.E.2d at 170–171; *Payton, supra* note 37, 182 Cal.Rptr. at 229; *Katsetos, supra* note 37, 368 A.2d at 182; *Miller, supra* note 37, 508 A.2d at 929; *Norton, supra* note 37, 89 S.E.2d at 812; *Vaughn, supra* note 37, 370 S.W.2d at 596; *Capps, supra* note 37, 369 P.2d at 240; *McGulpin, supra* note 37, 43 N.W.2d at 125–126; *Dore, supra* note 37, 148 A.2d at 695–696.

**39.** *Johnston, supra* note 37, 344 S.E.2d at 170–171; *Katsetos, supra* note 37, 368 A.2d at 182; *Norton, supra* note 37, 89 S.E.2d at 812; *Vaughn, supra* note 37, 370 S.W.2d at 596; *Capps, supra* note 37, 369 P.2d at 240; *McGulpin, supra* note 37, 43 N.W.2d at 125–126; *Dore, supra* note 37, 148 A.2d at 695–696.

**40.** *See in this connection Mozingo v. Pitt County Memorial Hospital*, 101 N.C.App. 578, 400 S.E.2d 747 (1991), *aff'd* 331 N.C. 182, 415 S.E.2d 341 (1992) (the *on-call* physician owes patients a duty of reasonable care in supervising obstetrics residents); Stewart R. Reuter, *Professional Liability In Postgraduate Medical Education: Who is Liable for Resident Negligence?*, 15 J.Legal Med. 485 (Part VII(A)(2)); Annot., *What Constitutes Physician–Patient Relationship For Malpractice Purposes*, 17 ALR4th 132, 152 § 8 (1982).

**41.** *Mozingo, supra* note 40, 400 S.E.2d at 752; *Reuter, supra* note 40.

**42.** The intra-hospital memorandum, written on the letterhead of the University of Oklahoma Health Sciences Center, Department of Obstetrics and Gynecology, College of Medicine, states:

"TO: Resident and Faculty Staff
FROM: ... [names of department heads]
DATE: June 18, 1991
SUBJECT: Who Does What To Whom
This memo is prompted by the need for consistency of supervision of resident surgeons.
Rule 1: SMD physicians will not perform major surgery without the faculty being

ing to the defendant physician's reading of the pertinent rule, the words "and the attending" mean *"and/or"* the attending physician. He concludes that since his absence from surgery was consistent with that standard of care he stands legally exonerated from liability for negligence. Jackson points to the same document, but draws the opposite *conclusion*—that the hospital rule requires *both* the *chief resident* physician and the *attending faculty* physician to be present during the surgery.

▮ While the physician's material *may have* demonstrated that his absence from surgery was *consistent with the intra-hospital standard of care* (assuming that his pre-

ferred construction of the memorandum is correct), *he failed to show* that his absence from surgery was consistent with the *law's required standard of due care.*[43] A hospital safety rule serves in law the same function as any other non-legislative safety standard.[44] Although it is material and relevant on the issue of *quality of care* required of an attending faculty physician, it does not establish the degree of care that is legally due.[45]

▮ Because the intra-hospital memorandum is *not conclusive* of due care, it does not *eliminate* from trial the disputed issue of whether Rossavik's absence from surgery was consistent or inconsistent *with the law's governing standard of due care for the sce-*

scrubbed and being the first assistant and surgeon of record.

Rule 2: For post partum tubals and other minor gynecologic procedures any licensed physician may supervise the surgery performed by an SMD physician at the discretion of the chief resident and the attending on the service. The licensed physician will be the surgeon of record.

Rule 3. Licensed physicians in the second and third year of their training may perform major surgery *at the discretion and the supervision of the chief resident on the service and the attending.* In all such cases the primary surgeon should have a note in the chart identifying the fact that he/she has worked up or otherwise followed the patient.

There is nothing in these policies that is intended to restrict surgical opportunities at any level. Its purpose is to increase the level of supervision given to the least experienced operators...." (Emphasis supplied.)

**43.** A well-known principle of tort law—one that was expressed in an admiralty opinion by Judge Learned Hand, *The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.1932)—is that compliance with custom (or other non-legislative standard) does not constitute in law an absolute defense to a tort claim. Describing the appropriate weight to be accorded industry standards, Judge Hand states:

"There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. * * * Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; *a whole calling may have unduly lagged in the adoption of new and available devices.* It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." (Emphasis supplied.)

**44.** *See* Annot., *Admissibility in Evidence, on Issue of Negligence, of Codes or Standards of Safety Issued or Sponsored by Governmental Body or by Voluntary Association,* 58 ALR3d 148, 175–177 (1974); Marian P. Opala, *The Anatomy of Private Standards–Making Process: The Operating Procedures of the USA Standards Institute,* 22 Okl. L.Rev. 45, 63–66 (1969).

**45.** *See, e.g., Petriello v. Kalman,* 215 Conn. 377, 576 A.2d 474, 478–479 (1990); *Van Steensburg v. Lawrence & Memorial Hospitals,* 194 Conn. 500, 481 A.2d 750, 752 (1984); *Darling v. Charleston Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253, 257 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966) (quoting from *Hooper, supra* note 43 at 740); *Ziegert v. South Chicago Community Hospital,* 99 Ill.App.3d 83, 97–99, 54 Ill.Dec. 585, 597, 425 N.E.2d 450, 462 (1981); *Davenport v. Ephraim McDowell Memorial Hospital, Inc.,* 769 S.W.2d 56, 61 (Ky.App.1989); *Cornfeldt v. Tongen,* 262 N.W.2d 684, 703–704 (Minn.1977); *Boland v. Garber,* 257 N.W.2d 384, 386 (Minn.1977); *Foley v. Bishop Clarkson Memorial Hospital,* 185 Neb. 89, 173 N.W.2d 881, 884 (1970); *Stone v. Proctor,* 259 N.C. 633, 131 S.E.2d 297, 299–300 (1963); *Bly v. Rhoads,* 216 Va. 645, 222 S.E.2d 783, 789 (1976); *Annot., supra* note 44 at 174–177; *Opala, supra* note 44 at 63–66. *See also Attocknie v. Carpenter Manufacturing, Inc.,* Okl. App., 901 P.2d 221, 228 (1995), *cert. denied* (1995), a products liability suit, where the court observes:

"It is clear that *compliance by a manufacturer with federal safety standards does not establish that an automobile is not defectively designed as a matter of law. Murphy v. Nissan Motor Corporation in U.S.A.,* 650 F.Supp. 922, 929 (E.D.N.Y.1987); *Karns v. Emerson Electric Co.,* 817 F.2d 1452, 1457 (10th Cir.1987). Whether the bus in question [the vehicle in suit] was defectively designed or not is a question of fact for the jury." (Emphasis added.)

nario in contest. Where a negligence claim rests on a breached standard of duty that is not legally *fixed with precision* but remains *variable*—thus fluctuating with the circumstances of the case—the presence or absence of care that is the plaintiff's due tenders a controversy for jury resolution.[46]

■ In sum, a physician's adherence to internal standards of the health-care facility is nothing more than *evidence* of due care—not due care by force of law irrefutably established. The core issue in the summary process before us was whether the physician's absence from the operating room may be regarded as negligence. *Rossavik bore the burden of producing exonerating probative material that would make his presence in surgery unnecessary beyond any factual dispute.* In this he failed. Summary judgment should not have gone to him.

### SUMMARY

The purview of protection from liability affordable by the GTCA does not encompass the practice of the healing art by providing medical or surgical services for patients. The claim against the defendant faculty physician arose *from his treatment of patients.* The trial court clearly erred in giving summary judgment based on the physician's perceived GTCA-conferred immunity.

By her evidentiary material Jackson showed that, at trial, her claim could come within the doctrine of *res ipsa loquitur.* This shifted to the physician the burden of producing evidentiary material establishing that, as a matter of law, his presence in surgery was unnecessary and his absence free of negligence. The intra-hospital memorandum on which he relied for this showing is *inconclusive* on that issue. It demonstrates *neither uncontradicted negligence nor undisputed due care.* Because both the claim and defense rest on variable standards for patient safety, the resolution of the physician's liability, if any he have, presents a controverted issue of fact.

The trial court's summary judgment is reversed and the cause is remanded for further proceedings not inconsistent with this pronouncement.

KAUGER, V.C.J., and LAVENDER, HARGRAVE, OPALA and SUMMERS, JJ., concur.

WILSON, C.J., concurs in result;

HODGES, SIMMS and WATT, JJ., dissent.

---

**46.** *Byford v. Town of Asher,* Okl., 874 P.2d 45, 50 (1994) (Opala, J., concurring); *Wetsel v. Independent School Dist. I–1,* Okl., 670 P.2d 986, 990–991 (1983); *Federer v. Davis,* Okl., 434 P.2d 197, 198–199 (1967); *Lee v. Darden,* Okl., 421 P.2d 845, 848 (1966); *Sand Springs Ry. Co. v. Cole,* Okl., 279 P.2d 938, 942–943 (1955); *City of Cushing v. Stanley,* 68 Okl. 155, 172 P. 628 (1918); *Ponca City Ice Co. v. Robertson,* 67 Okl. 86, 169 P. 1111, 1113 (1917).