2003 OK 29

STATE of Oklahoma ex rel. Margaret B. FENT and Jerry R. Fent, as State of Oklahoma resident taxpayers, Plaintiffs/Appellants,

v.

STATE of Oklahoma ex rel. OKLAHOMA WATER RESOURCES BOARD; State of Oklahoma ex rel. Water Conservation Storage Commission; and J. Ross Kirtley, Richard McDonald, Dick Seybolt, Lonnie Farmer, Grady Grandstaff, Ervin Mitchell, Bill Secrest, Richard Sevenoaks, and Wendell E. Thomasson, as individuals and as members of the Okla-

homa Water Resources Board and the Water Conservation Storage Commission; and The United States of America ex rel. Department of Defense, Department of The Army and its Corps of Engineers, Defendants/Appellees.

No. 96,276.

Supreme Court of Oklahoma.

March 18, 2003.

William A. Pipkin, Moore, OK, for Plaintiffs/Appellants.

Andrew Tevington and E. Clyde Kirk, Assistant Attorneys General, Oklahoma City, OK, for Defendants/Appellees.

OPALA, V.C.J.

¶ 1 The dispositive issue in this taxpayers' *qui tam* [1] action is whether summary judgment was correctly given to defendants. We answer this question in the affirmative. Although like the Court of Civil Appeals, we affirm the trial court's ruling, we disagree with the appellate court's decision to resolve the critical issue on constitutional grounds when legal relief is available on an alternative, non-constitutional basis. We hence vacate the appellate court's opinion and affirm the summary disposition of taxpayers' claim.

## I

### ANATOMY OF LITIGATION

¶ 2 The Flood Control Act of 1962 [2] authorized the United States Army Corps of Engineers (the Corps) to construct the Clayton Reservoir on the Kiamichi River in Oklahoma "in accordance with the recommendation of the Chief of Engineers in Senate Doc. 145, 87th Cong., at an estimated cost of $29,748.00" (the project).[3] The project was to have multiple purposes, including water supply. Under the provisions of the federal

---

1. A *qui tam* action is one brought under a statute that establishes a penalty for the commission or omission by a public official of a certain act and provides that the penalty shall be recoverable in a civil action, with part of it going to the one bringing the action and the rest to the state or a public body. *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 542, 63 S.Ct. 379, 383 n. 4, 87 L.Ed. 443, 448 (1943); *Marvin v. Trout,* 199 U.S. 212, 225, 26 S.Ct. 31, 34–35, 50 L.Ed. 157, 162 (1905); *Abbadessa v. Tegu,* 121 Vt. 215, 154 A.2d 483, 484 (1959); *New Jersey S.P.C.A. v. Russ,* 83 N.J.L. 450, 83 A. 961, 962 (1912); *Stevenson v. Stoufer,* 237 Iowa 513, 21 N.W.2d 287, 289 (Iowa.1946); *see also* Black's Law Dictionary, 6th Ed. (1990) at p. 1251; Webster's Third New International Dictionary Unabridged 1867 (1961). The term *"qui tam"* is an abbreviation of the longer Latin phrase *"qui tam pro domino rege quam pro se ipso in hac parte sequitur,"* meaning "he who brings an action for the King as well as for himself." *United States ex rel. Stillwell v. Hughes Helicopters, Inc.,* 714 F.Supp. 1084, 1086 (C.D.Cal.1989); *see also* W. Blackstone, Commentaries on the Law of England 160 (1768). *Qui tam* provisions, more than one court has astutely observed, are "passed upon the theory, based on experience as old as modern civilization, that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting, if you please, under the strong stimulus of personal ill will or the hope of gain. Prosecutions conducted by such means compare with the ordinary methods as the enterprising privateer does to the slow-going public vessel." *Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 949, 117 S.Ct. 1871, 1877, 138 L.Ed.2d 135 (1997), (*quoting United States v. Griswold,* 24 F. 361, 366 (D.Or.1885)). In *Marvin, supra,* 199 U.S. at 225, 26 S.Ct. at 34–35, the Court noted: "Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government. The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer."

2. Pub.L. 87–874, Title II, § 201 *et seq.,* 76 Stat. 1173 (1962).

3. *Id.* at § 203.

Water Supply Act of 1958,[4] any non-federal interest that benefits from the water supply component of a federal project must agree to pay for the share of construction costs allocated to water supply.[5]

¶ 3 In the 1970's, decisions regarding state participation in water supply projects in Oklahoma were among the duties of a state commission known as the Water Conservation Storage Commission (WCSC).[6] As the non-federal participant in the Clayton Reservoir project, later renamed Sardis Lake,[7] the WCSC in 1974 entered into a contract (the contract) with the Corps under which the WCSC agreed to pay the costs of the project allocated to water supply, then estimated to be $16,399,000.[8] Under the contract, approximately $7.8 million was allocated to storage for present demand and approximately $8.5 million was allocated to storage for future demand. With respect to storage for present demand, the contract states:

> The amount of the Project investment costs allocated to the storage for present demand *shall be paid in 50 consecutive*

*annual installments,* the first of which shall be due and payable within 30 days after the User [the WCSC] is notified by the contracting Officer that the Project is completed and operational for water supply purposes. Annual installments thereafter will be due and payable on the anniversary date of the first payment. *Except for the first payment which will be applied solely to the retirement of principal, all installments shall include accrued interest on t*he unpaid balance . . . ." (emphasis added)

Payments of principal and interest allocated to future demand storage space were not required to begin until ten years after the project became operational unless the State commenced using that storage space during that period.

¶ 4 In addition to contracting to repay the project's construction costs, the WCSC also agreed to pay a percentage of the annual operating and maintenance costs, to pay a portion of the costs of any major capital replacement items, and to hold the Corps

4. The Water Supply Act of 1958 is codified at 43 U.S.C. § 390b.

5. *Id.* The pertinent provisions of the Water Supply Act of 1958 state:

   "In carrying out the policy set forth in this section, it is hereby provided that storage may be included in any reservoir project surveyed, planned, constructed or to be planned, surveyed and/or constructed by the Corps of Engineers or the Bureau of Reclamation to impound water for present or anticipated future demand or need for municipal or industrial water, and the reasonable value thereof may be taken into account in the estimating the economic value of the entire project: *Provided,* That the cost of any construction or modification authorized under the provisions of this section shall be determined on the basis that all authorized purposes served by the project shall share equitably in the benefits of multiple purpose construction, as determined by the Secretary of the Army or the Secretary of the Interior, as the case may be: *Provided further,* That before construction or modification of any project including water supply provisions for present demand is initiated, State or local interests shall agree to pay for the cost of such provisions in accordance with the provisions of this section: *And provided further,* That not to exceed 30 per centum of the total estimated cost of any project may be allocated to anticipated future demands where State or local interests give reasonable assurances, and there

is reasonable evidence, that such demands for the use of such storage will be made within a period of time which will permit paying out the costs allocated to water supply within the life of the project[.]"

6. The Legislature authorized the WCSC to enter into contracts with the federal government or its responsible agency, department, or instrumentality for the construction of water supply storage space. 82 O.S.2001, § 1085.21.

7. *See* Pub.L. 97–88, December 4, 1981, 95 Stat 1135, which changed the name of the project to Sardis Lake. It states:

   "Sec. 108. Clayton Lake which is an element of the flood control project for the Clayton and Tuskahoma Reservoirs, Kiamichi River, Oklahoma, authorized by section 203 of the Flood Control Act of 1962 (76 Stat. 1187), shall hereafter be known as 'Sardis Lake'. Any law, regulation, map, document, or record of the United States in which such lake is referred to shall be held and considered to refer to such lake as 'Sardis Lake'."

8. The project's cost was seriously underestimated. As of 2002, actual costs allocated to water supply were approximately $38 million. The contract authorized the Corps to determine the actual costs of construction and it was agreed that the WCSC's annual payment obligation would be adjusted accordingly.

harmless from liability for damages incurred on account of the water storage component of the project. The contract does not give the WCSC a right to terminate the agreement or otherwise to be relieved of its contractual obligations, but as permitted by federal law,[9] it contains the following provision:

"The parties agree that this contract is not an obligation for which the full faith and credit of the State of Oklahoma is pledged. Nothing herein shall be construed as legally obligating the Oklahoma Legislature to make any appropriation of funds."

¶ 5 Finally, the contract recites the opinion of the Oklahoma Attorney General that the WCSC is acting within its authority in entering into the contract.

¶ 6 The project became operational for water storage purposes on 6 January 1983 and the Corps notified the Oklahoma Water Resources Board (the OWRB or the Board),[10] which had assumed the functions of the WCSC in 1979,[11] that the first installment, together with the operating and maintenance

costs for the ensuing year, was due within thirty (30) days.[12] Because the legislature had not appropriated funds for the first payment in the FY83 budget, the OWRB could not make the first payment until after the start of FY84. The payment was hence not made until 17 August 1983 and thus began a still-unresolved dispute over the state's liability for interest on late payments. The OWRB made periodic payments between 1983 and 1997 amounting to $4,414,700.69 and incurred an arrearage by the time this action was brought in excess of $3,000,000.00.

¶ 7 A group of taxpayers in 1997 served on the OWRB and its members a written demand that the Board "authorize and diligently prosecute an action to recover" from the federal government all payments made under the contract.[13] The group's demand asserted that the contract creates a state debt in violation of the budget balancing provisions of the Oklahoma Constitution, Article 10, § 23,[14] § 24,[15] and § 25.[16] The Board denied the group's request.

9. Federal law requires the execution of a written agreement between the Army Corps of Engineers and State or local interests before construction of a water resource project may begin. *See* the provisions of 42 U.S.C.A. § 1962d–5b (a). It also recognizes that many state constitutions contain balanced budget restrictions, which affect the states' ability to contract long-term debt. Congress hence provided in § 1962d–5b(a) that the following language may be included in water resource project contracts:

"In any such agreement entered into by a State, or a body politic of the State which derives its powers from the State constitution, or a governmental entity created by the State legislature, the agreement may reflect that it does not obligate future appropriations for such performance and payment when obligating future appropriations would be inconsistent with constitutional or statutory limitations of the State or a political subdivision of the State."

10. The OWRB, a nine member Board, was created by the Legislature in 1957 to implement the public policy of the state in regard to the conservation and utilization of the state's waters. *See* 82 O.S.2001, § 1084.1 *et seq.*

11. Pursuant to the Oklahoma Sunset Law, 74 O.S. Supp.1980, § 3903, the WCSC was terminated on 1 July 1978 and ceased to exercise it powers, duties, and functions on 1 July 1979. Its extant obligations were assumed on that date by

the Oklahoma Water Resources Board. *See* 82 O.S.2001, § 1085.38.

12. The first annual installment was for $353,257.00. The operating and maintenance costs were $61,850.00. The total amount paid was $415,107.00.

13. The written demand was made pursuant to the provisions of 62 O.S.1991, § 373, which requires as a precondition of bringing a *qui tam* action that a written demand first be made upon the proper state officials to take specified action. The state officials must refuse or otherwise fail to take the requested action before a *qui tam* action may be brought.

14. The provisions of OKLA. CONST. Art. 10, § 23 state in relevant part:
"The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma."

15. The provisions of OKLA. CONST. Art. 10, § 24 state in relevant part:
"In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war...."

16. The provisions of OKLA. CONST. Art. 10, § 25 state in relevant part:

¶ 8 Two of the taxpayers who had issued the written demand, Margaret B. Fent and Jerry R. Fent (taxpayers) filed this *qui tam* action pursuant to the provisions of 62 O.S.1991, § 372 [17] and 62 O.S.1991, § 373,[18] haling into court as statutory defendants [19] the State of Oklahoma *ex rel.* the OWRB and ex rel. the WCSC and as real-party defendants the United States of America, the Department of Defense, the Army Corps of Engineers (collectively the United States or the federal defendants) and the nine individuals who were served with the written demand and who sat on the OWRB at the time the action was filed (defendants or individual defendants).

¶ 9 The petition alleged that the contract between the WCSC and the Corps violated the Oklahoma Constitution and that all payments made pursuant to the contract were therefore unlawful. The petition further alleged that the individual defendants had wrongfully refused to prosecute an action for the return of the funds from the United States. Taxpayers sought to hold the federal and individual defendants jointly and severally liable under the *qui tam* statutes for the return to the State of Oklahoma of all public funds paid under the contract and for treble damages of $13,244,102.07, half of which

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election...."

17. The pertinent provisions of 62 O.S.1991, § 372 state:

"Every officer of the state ... who shall hereafter order or direct the payment of any money or transfer of any property belonging to the state ... in settlement of any claim known to such officers to be fraudulent or void, or in pursuance of any unauthorized, unlawful or fraudulent contract or agreement made or attempted to be made, for the state ... by any officer thereof ... shall be jointly and severally liable in damage to all innocent persons in any manner injured thereby, and shall be furthermore jointly and severally liable to the state ... for triple the amount of all such sums of money so paid, and triple the value of property so transferred, as a penalty, to be recovered at the suit of the proper officers of the state ... or of any resident taxpayer thereof, as hereinafter provided."

18. The pertinent provisions of 62 O.S.1991, § 373 state:

"Upon the refusal, failure or neglect of the proper officers of the state ... after written demand made upon them by ten resident taxpayers of the state ... to institute or diligently prosecute proper proceedings at law or in eq-

uity for the recovery of any money or property belonging to the state ..., paid out or transferred by any officer thereof in pursuance of any unauthorized, unlawful, fraudulent, or void contract made, or attempted to be made, by any of its officers for the state ... or for the penalty provided in the preceding section, any resident taxpayer of the state ... affected by such payment or transfer after serving the notice aforesaid and after giving security for cost, may in the name of the State of Oklahoma as plaintiff, institute and maintain any proper action which the proper officers of the State ... might institute and maintain for the recovery of such property, or for said penalty; and such municipality shall in such event be made defendant, and one-half (½) the amount of money and one half (½) the value of the property recovered in any action maintained at the expense of a resident taxpayer under this section, shall be paid to such resident taxpayer as a reward."

19. The provisions of 62 O.S.1991, § 373 require the *qui tam* plaintiff to name the State (or other relevant public body) as a defendant, but the public body's status is that of a statutory party beneficiary. *State ex rel. Trimble v. City of Moore*, 1991 OK 97, ¶ 19, 818 P.2d 889,895. The *qui tam* plaintiff wages war on behalf of the public body whose money has allegedly been unlawfully expended or whose property has allegedly been unlawfully transferred. If the battle is won, the "spoils of war" go to the public body and a reward is conferred upon the *qui tam* plaintiff. *Trimble, supra.* Although § 373 refers only to a "municipality" in the context of naming the affected public body as a defendant, it was clearly the intent of the Legislature that any governmental body on whose behalf a *qui tam* action is brought should also be named as a defendant. *Moser v. Liberty Mutual Ins. Co.*, 1986 OK 78, ¶ 6, 731 P.2d 406, 409; *State ex rel. Scott v. State ex rel. University Hosp. Authority*,

would be payable to them and half to the State.

¶ 10 The cause was removed by the federal defendants to the United States District Court for the Western District of Oklahoma. That court dismissed taxpayers' claim against the federal defendants on sovereign immunity grounds and dismissed without prejudice taxpayers' claim against the remaining defendants—the State *ex rel.* the state agencies and the individual defendants—on the grounds of Eleventh Amendment immunity. Taxpayers appealed. The Tenth Circuit Court of Appeals affirmed the dismissal as to the federal defendants, but vacated the dismissal of the claim against the state defendants and remanded the cause to the federal district court with directions that the claim against the state defendants be remanded to state court.[20]

¶ 11 Upon remand to Oklahoma County District Court, taxpayers filed a motion for summary judgment, arguing that the uncontroverted facts, consisting of the contract and the conduct of state officials in carrying it out, established that the contract violated the constitutional prohibition on contracting debt and that they were hence entitled to judgment as matter of law.[21] Defendants filed

their own motion for summary judgment, arguing that the contract is not unconstitutional, but even if it were, the members of the Board cannot be held civilly liable under the *qui tam* statutes because their actions were taken in conformity with the advice of the state Attorney General that the contract was lawful.

¶ 12 The trial court gave judgment to defendants without elaboration. Taxpayers appealed and the Court of Civil Appeals affirmed, adopting defendants' contention that the contract does not violate the state Constitution. We granted certiorari on taxpayers' petition. While we agree that summary judgment is defendants' due, we vacate the appellate court's opinion because we deem it unnecessary to reach the constitutional issue. Where the legal relief sought is affordable on non-constitutional grounds, consideration of constitutional infirmities is deemed precluded by a self-erected "prudential bar" of restraint.[22] There is no need in this case to determine the constitutionality of the contract because the defendants cannot in any event be held civilly liable for treating the contract as lawful in conformity with the advice of the Attorney General.[23]

1994 OK CIV APP 163, ¶¶ 9–11, 887 P.2d 1385, 1387.

20. *See Fent v. Oklahoma Water Resources Board,* 235 F.3d 553 (10th Cir.2000).

21. Rules for District Courts of Oklahoma, 12 O.S.2001, ch. 2, app., Rule 13(e) provides:
"e. If it appears to the court that there is no substantial controversy as to the material facts and that one of the parties is entitled to judgment as a matter of law, the court shall render judgment for said party."

22. The prudential rule of necessity, adhered to by all state and federal courts, holds that constitutional issues must not be resolved in advance of strict necessity. *In re Initiative Petition No. 363, State Question No. 672,* 1996 OK 122, ¶ 13, 927 P.2d 558, 565; *In re Initiative Petition No. 347, State Question No. 639,* 1991 OK 55, ¶ 2, 813 P.2d 1019, 1037 (Opala, C.J., concurring); *Smith v. Westinghouse Elec. Corp.,* 1987 OK 3, ¶ 2, n. 3, 732 P.2d 466, 468, n. 3; *I.N.S. v. Chadha,* 462 U.S. 919, 936, 103 S.Ct. 2764, 2776–77, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). *See also Schwartz v. Diehl,* 1997 OK 115, ¶ 9, 568 P.2d 280, 283; *Dablemont v. State Dept.*

*of Pub. Safety,* 1975 OK 162, ¶ 9, 543 P.2d 563, 564.

23. After the Court of Civil Appeals issued its opinion, taxpayers filed a motion for a stay of the proceedings in state court pending the outcome of an action filed in 1998 in the United States District for the Northern District of Oklahoma, No. 98CV521–K–(E), in which the United States sued the State of Oklahoma and the OWRB, seeking (1) a declaratory judgment on the duties and obligations of the State of Oklahoma under the contract at issue in this case, (2) injunctive relief directing the State to specifically perform the contract, and (3) injunctive relief estopping the State from claiming it is not liable to the United States under the contract. Defendants' response to the motion, which identified the federal case as No. C–521(B), states that the federal district court administratively closed the case on 27 May 1999 pending the outcome of the instant case. The only pleading filed in the federal case which is tendered by the record in this case is the United States' complaint, which for obvious reasons does not raise the constitutional issue urged by taxpayers in this case. Whether that issue was raised in the federal lawsuit by other pleadings cannot be determined from this record.

## II

## STANDARD OF REVIEW ON SUMMARY PROCESS

¶ 13 Summary process—a special pretrial procedural track pursued with the aid of acceptable probative substitutes [24]—is a search for undisputed material facts which, *sans* forensic combat, may be utilized in the judicial decision-making process.[25] Summary process is applied where neither the material facts nor any inferences that may be drawn from undisputed facts are in dispute, and the law favors the movant's claim or liability-defeating defense. To that end, the court may consider, in addition to the pleadings, items such as depositions, affidavits, admissions, answers to interrogatories, as well as other evidentiary materials which are offered by the parties in acceptable form.[26] Only those evidentiary materials which eliminate from trial some or all fact issues on the merits of the claim or defense afford legitimate support for nisi prius resort to summary adjudication.[27]

¶ 14 Summary relief issues stand before us for de novo examination.[28] All facts and inferences must be viewed in the light most favorable to the non-movant.[29] Just as nisi prius courts are called upon to do, so also appellate tribunals bear an affirmative duty to test all evidentiary material tendered in summary process for its legal sufficiency to support the relief sought by the movant.[30] Only if the court should conclude that there is no material fact in dispute and the law favors the movant's claim or liability-defeating defense is the moving party entitled to summary judgment in its favor.[31]

## III

## PUBLIC OFFICERS MAY NOT BE HELD CIVILLY LIABLE UNDER THE *QUI TAM* STATUTES WHEN THEY ACT IN CONFORMITY WITH AN OPINION OF THE ATTORNEY GENERAL THAT THEIR ACTIONS ARE LAWFUL

¶ 15 Defendants argue that the trial court's summary disposition in their favor was correct because a public official is insulated from civil liability for actions taken in reliance upon the advice of the state Attorney General.[32] We agree.

24. " 'Acceptable probative substitutes' are those which may be used as 'evidentiary materials' in the summary process of adjudication." *Jackson v. Okla. Memorial Hosp.*, 1995 OK 112, ¶ 15, n. 35, 909 P.2d 765, 773, n. 35. *See also Seitsinger v. Dockum Pontiac, Inc.*, 1995 OK 29, ¶ 18, 894 P.2d 1077, 1080–81; *Davis v. Leitner*, 1989 OK 146, ¶ 15, 782 P.2d 924, 926–27.

25. The focus in summary process is not on the facts which might be proven at trial, but rather on whether the tendered proof in the record reveals only undisputed material facts supporting but a single inference that favors the movant's quest for relief. *Polymer Fabricating, Inc. v. Employers Workers' Compensation Ass'n.*, 1998 OK 113, ¶ 7, 980 P.2d 109, 112; *Hulsey v. Mid-America Preferred Ins. Co.*, 1989 OK 107, ¶ 8, n. 15, 777 P.2d 932, 936, n. 15.

26. *Polymer, supra* note 25 at ¶ 8, at 113.

27. *Russell v. Bd. of County Comm'rs*, 1997 OK 80, ¶ 7, 952 P.2d 492, 497. *See also Gray v. Holman*, 1995 OK 118, ¶ 11, 909 P.2d 776, 781.

28. An order that grants summary relief, in whole or in part, disposes solely of law questions. It is thus reviewable by a de novo standard. *Brown v. Nicholson*, 1997 OK 32, ¶ 5, 935 P.2d 319, 321. *See also Kluver v. Weatherford Hosp. Auth.*, 1993

OK 85, ¶ 14, 859 P.2d 1081, 1083 ("Issues of law are reviewable by a de novo standard and an appellate court claims for itself plenary, independent and non-deferential authority to re-examine a trial court's legal rulings.").

29. *Carmichael v. Beller*, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053.

30. *Spirgis v. Circle K Stores, Inc.*, 1987 OK CIV APP 45, ¶ 10, 743 P.2d 682, 685 (approved for publication by the Oklahoma Supreme Court).

31. It is not the purpose of summary process to substitute a trial by affidavit for one by jury, but rather to afford a method of summarily terminating a case (or eliminating from trial some of its issues) when only questions of law remain. *Russell, supra* note 27, at 503; *Bowers v. Wimberly*, 1997 OK 24, ¶ 18, 933 P.2d 312, 316; *Stuckey v. Young Exploration Co.*, 1978 OK 128, ¶ 15, 586 P.2d 726, 730.

32. The Court of Civil Appeals' opinion did not address this issue. Our pronouncement in *Hough v. Leonard*, 1993 OK 112, 867 P.2d 438, teaches that the prevailing party in the Court of Civil Appeals may obtain this court's review of issues properly raised and briefed on appeal, *but not addressed by the intermediate appellate court*,

¶ 16 The state Constitution establishes the office of the attorney general.[33] The duties and responsibilities of the Attorney General are prescribed by statute.[34] As the state's chief law officer,[35] the Attorney General has been entrusted with the duty of providing legal guidance to public officers and of advising them on questions of law which relate to their official duties.[36] With the exception of an Attorney General's opinion that an act of the legislature is unconstitutional,[37] an Attorney General's opinion is binding upon the state officials whom it affects.[38] Public officers have the duty to follow Attorney General opinions until they are judicially relieved of compliance.[39] *Since a public officer's failure to heed the Attorney General's advice to perform a duty required by law can result in civil penalties, it also* *follows from sound principles of policy that one who acts in conformity with the Attorney General's advice should be afforded the law's protection from civil liability as well as from forfeiture of office, at least until a clear judicial pronouncement would indicate a different course of conduct.*[40]

¶ 17 Appended to the end of the contract at issue is the Attorney General's opinion that the contract is lawful. It states:

"It is my opinion that this contract is within the authority of the contracting agency and in reaching this conclusion I have considered the effect of Section 221 of the Flood Control Act 1970 (42 USC 1962d–5b)."

¶ 18 Acting on the Attorney General's advice, members of the WCSC and the OWRB,

without filing a petition for certiorari. *Id.* at ¶ 18, at 446; Rule 1.180, Oklahoma Supreme Court Rules, 12 O.S.2001, Ch. 15, App. 1.

**33.** *See* the provisions of OKLA. CONST. Art. 6, § 1(A), which state in pertinent part:
"The Executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor and Inspector, Attorney General, State Treasurer, Superintendent of Public Instruction, Commissioner of Labor, Commissioner of Insurance and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law."

**34.** The terms of § 74 O.S.2001, § 18b provide in pertinent part:
"The duties of the Attorney General as the chief law officer of the state shall be:
* * * * * *
5. To give an opinion in writing upon all questions of law submitted to the Attorney General by the Legislature or either branch thereof, or by any state officer, board, commission or department, provided, that the Attorney General shall not furnish opinions to any but district attorneys, the Legislature or either branch thereof, or any other state official, board, commission or department, and to them only upon matters in which they are officially interested; ..."

**35.** *See* the provisions of 74 O.S.2001, § 18, which state:
"The Attorney General shall be the chief law officer of the state."

**36.** *Hendrick v. Walters,* 1993 OK 162, ¶ 19, 865 P.2d 1232, 1243. Many public officials are not lawyers. Legal assistance often is needed if the law's functional meaning cannot be ascertained from its text and without its construction by an exercise of professional skills. *Id.* at n. 51.

**37.** In *Rasure v. Sparks,* 1919 OK 231,75 Okla. 181, 183 P. 495, we held that an Attorney General's opinion is binding on state officials unless the opinion is inconsistent with a final determination of a court of competent jurisdiction. *Id.* at ¶ 7, at 498. That pronouncement governed the effect of opinions of the Attorney General until 1984 when we held in *State ex rel. York v. Turpen,* 1984 OK 26, 681 P.2d 763 that no official or agency is bound by the Attorney General's view of a constitutional infirmity ("[T]he issuance of an opinion [by the Attorney General] finding an act of the legislature unconstitutional is ... an unwarranted encroachment upon the power of the legislature and the unique duty of the courts."). *Id.* at ¶ 12, at 767. The scope of the *York* exception was clarified in *Branch Trucking Co. v. State ex rel. Okla. Tax Comm'n,* 1990 OK 41, 801 P.2d 686, in which we stated that *York* was an exception to the general rule established in *Rasure* and that the *Rasure* pronouncement continues to govern where an Attorney General's opinion does not declare a statute unconstitutional. *Id.* at ¶ 11, at 690.

**38.** *Rasure, supra* note 37, at ¶ 7, at 498; *Globe Life and Accident Ins. Co. v. Okla. Tax Comm'n,* 1992 OK 65, ¶ 8, 831 P.2d 649, 650; *Branch Trucking, supra* note 37, at ¶ 11, at 690.

**39.** *See* authorities cited *supra* note 38.

**40.** *Hendrick, supra* note 36, at ¶ 20, at 1243; *Allen v. State ex rel. Bd. of Trustees of the Okla. Uniform Retirement System for Justices and Judges,* 1988 OK 99, ¶ 15, n. 33, 769 P.2d 1302, 1308, n. 33.

as well as successive governors and legislatures, have treated the contract at issue as lawful. For the defendants to have acted on taxpayers' written demand to obtain a refund from the United States of the state funds paid under the contract would have been in direct conflict with the advice given by the state's chief law officer charged with the duty of providing them with legal advice. "Sound principles of policy" dictate that public officials should be shielded from civil liability in such circumstances. For this reason, we join in the trial court's view that summary judgment was defendants' due. That ruling is hence affirmed.

## IV

### SUMMARY

¶ 19 We hold today that the defendant state officials, who treated as lawful a contract which taxpayers allege is constitutionally infirm, cannot be held liable under the *qui tam* statutes regardless of the contract's constitutionality because they acted in conformity with an opinion of the Attorney General that the contract was lawful.

¶ 20 THE COURT OF CIVIL APPEALS' OPINION IS VACATED AND THE DISTRICT COURT'S DISPOSITION BY SUMMARY JUDGMENT IS AFFIRMED.

¶ 21 WATT, C.J., and HODGES, LAVENDER, HARGRAVE, BOUDREAU and WINCHESTER, JJ., concur.

¶ 22 KAUGER and SUMMERS, JJ., concur in result.